Argued and submitted February 5, reversed and remanded
for new trial December 2, 1981

## PAULSON,
*Petitioner on review,*

*v.*

## WESTERN LIFE INSURANCE COMPANY,
*Respondent on review.*

(No. 109,720, CA 16061, SC 27254)

636 P2d 935

J. Michael Alexander, Salem, argued the cause for petitioner on review. With him on the petition and briefs was Brown, Burt, Swanson & Lathen, P.C., Salem.

John C. Mercer, Portland, argued the cause for respondent on review. With him on the brief was Landis, Aebi and Bailey, Portland.

Before Denecke, Chief Justice, and Tongue, Lent, Linde, Peterson, and Tanzer, Justices.

PETERSON, J.

Tanzer, J., dissenting opinion.

## PETERSON, J.

The rapid growth of group insurance in the United States has given rise to a number of cases in which the principal issue is whether the employer-policyholder, in the administration of the policy, is the agent of the insurer, of the insured worker, or the agent of neither. That issue, among others, is involved in this case.

### THE FACTS[1]

Roof & Floor Components, Inc., (hereinafter referred to as "employer" or as "policyholder") is a Salem concern that, in 1974, applied to the defendant for a "group insurance policy" that would provide its employees life insurance benefits, hospital expense benefits, supplemental accident expense benefits, and major medical expense benefits. The policy was issued and became effective on February 7, 1974. It provided for optional coverage of a worker's spouse and specified unmarried children.

The plan covered different classes of employees. A Class I employee qualified for personal coverage and dependents coverage without proof of insurability if application for coverage was made within 30 days following the first day of employment. Plaintiff was a Class I employee. Defendant issued a brochure, which the plaintiff never saw prior to the dispute which gave rise to this case, but which is nonetheless relevant. It provided:

> "When you enroll for benefits for your eligible dependents more than 31 days after you are initially eligible, it is necessary that satisfactory evidence of insurability be furnished to the insurance company. Benefits will be effective when approved by the insurance company. You will be notified as to the effective date."
>
> "* * * * *.
>
> "If you enroll when initially eligible, merely complete an enrollment form authorizing necessary salary/payroll deduction and return it to your supervisor.

---

[1] A verdict was directed for the defendant. On appeal from a directed verdict, we are required to consider the evidence in the light most favorable to the party against whom the verdict was directed. *City of Rogue River v. DeBoer*, 288 Or 485, 488, 605 P2d 697 (1980). For the most part, the evidence is without dispute, but as will be seen below, neither party was entitled to a peremptory finding.

"Should you wish to enroll more than 31 days after your initial eligibility date for benefits on your eligible dependents, it is necessary that evidence of insurability satisfactory to the insurance company be furnished. Special forms are available for this purpose. Benefits for you and your dependents will be effective when approved by the insurance company."[2]

The brochure also contained provisions relating to the duties of the insurer and the employer:

"The Insurance Company will perform the following functions:

1. Maintain records of all employees and dependents insured by the program.

2. Determine the eligibility of individual claimants for receipt of benefits.

3. Process claims for benefits.

4. Authorize the payment of benefits.

5. Make payments of benefits to beneficiaries.

6. Make determination on appeal of claim denials.

"The Plan administrator [the employer] will perform the following functions:

1. Receive and remit contributions for the program.

2. Maintain records of all employees and dependents insured.

3. Select the Insurance Carrier."

The insurance policy contained these provisions:

"**Data Required from Policyholder** [the employer]: The policyholder shall furnish periodically to the Company such information relative to individuals becoming insured, changes in amounts of insurance, and terminations of insurance as the Company may require for the administration of the insurance under this policy. The Company shall have the right to inspect any records of the Policyholder which relate to the insurance under this policy at any reasonable time.

---

[2] The brochure contained a provision to the effect that the brochure was "not a part of the insurance contract. Your coverage is fully explained by your certificate. You should read it carefully and then place it in the pocket at the back of this booklet for safekeeping."

Reference is made to the brochure because it, more than the policy itself, sets forth the legal effect of the policy in understandable terms. The brochure also reflects the insurer's opinion as to the legal effect of the policy and it also sets forth some policy practices which, as will be seen below, are relevant.

"**Clerical Error:** The Policyholder's failure, due to clerical error, to report the name of any individual who has qualified for insurance under this policy or to report the name of any individual whose classification has been changed shall not deprive such individual of insurance under this policy or affect the amount of insurance to which he is entitled; nor shall the Policyholder's failure to report the termination of insurance for any individual continue such insurance beyond the date of termination determined in accordance with the provisions of this policy."

The insurer provided the employer with enrollment forms and claim forms which, as necessary, were given to the employees by the employer. Claim forms, after they were filled out, were normally mailed to the insurer by the employee.

The plaintiff came to work for the employer on June 23, 1976. His medical insurance then in effect—with another carrier—remained effective until October 1, 1976. Prior to going to work for the employer, he talked to the owner of the business, a Mr. Largent, about the company health insurance. Mr. Largent told the plaintiff that he could elect coverage for himself and for his dependents any time in the first six months of employment without any evidence of insurability required. Paulson therefore decided to keep his other coverage in effect "until it ran out" and then apply for coverage with the employer's carrier. Accordingly, on September 1, 1976, he received and filled out an application for coverage which was sent to the defendant, with appropriate premiums.

On November 3, 1976, the defendant wrote to the employer advising the employer that because the application was not made "* * * within the eligibility period as specified in your policy, evidence of insurability is required." A form was enclosed for Mr. Paulson to execute and return.

After this letter was received, Mr. Largent went "back and forth for about two weeks" with the company's agent, without resolution of the matter. Plaintiff was then advised of the problem. At about the same time, plaintiff's daughter became ill, and he incurred substantial medical

expenses to treat the illness. The plaintiff's claim for payment of these medical expenses was denied on the ground that the policy was not in effect.

The plaintiff thereafter filed this action against the defendant, alleging that on September 1, 1976, the defendant entered into an insurance contract with the plaintiff which, on November 25, 1976, was "* * * in effect or should have been in effect." The defendant filed an answer admitting its corporate status and denying the remainder of the plaintiff's complaint. The answer also contained an affirmative defense, which is not otherwise relevant to this opinion. The plaintiff's reply denied the affirmative allegations of the defendant's answer, and affirmatively alleged that plaintiff had relied upon the "statements by the Plaintiff's employer," and that the defendant was estopped from denying coverage.

On trial, at the conclusion of all the evidence, the defendant moved for a directed verdict on several grounds, one being that "* * * Largent was not acting as [the insurer's] agent * * *and the court should rule as a matter of law that he was not. * * *"

The plaintiff, on the other hand, requested a peremptory finding that Largent "* * * be considered the insurance company's agent as a matter of law," citing ORS 744.165, the significance of which is discussed below. After extended argument, the trial court granted the defendant's motion for directed verdict, saying:

"The evidence shows me that the acts of the employer, in this case, Mr. Largent, are nothing more than keeping a supply of application forms, claim forms, brochures, withholding premiums and terminating coverage when the employment ceases and such. It is merely administerial and nothing indicates to me that Mr. Largent was given any authority, apparent or actual, to actually represent the insurance company as agent in any respect."

The Court of Appeals, in a two-line per curiam opinion, affirmed, citing *Bowes v. Lakeside Industries, Inc.*, 297 Minn 86, 209 NW2d 900 (1973).

### "INSURER-ADMINISTERED PLANS" VIS-A-VIS "EMPLOYER-ADMINISTERED PLANS"

The defendant asserts:

"The majority rule is that the employer-master policyholder is not the agent of the insurer in a group insurance context. *Boseman v. Connecticut General Life Ins. Co.*, 301 U.S. 196, 57 S. Ct. 686, 81 L Ed. 1036 (1937); *Duval v. Metropolitan Life Ins. Co.*, 82 NH 543, 136A400, 50 ALR 1276 (1927). This longstanding rule is still the majority rule. \* \* \*"

■    Many courts and commentators also discuss cases such as this in terms of a "majority rule" and "minority rule." See cases cited and discussion in D. Gregg, *Group Insurance: Agency Characterization of the Master Policyholder,* 46 Wash L Rev 377 (1971), and R. Borst, *Group Policyholder as Agent of Insurer or Group Member,* Vol 14, No. 2, Federation of Insurance Counsel Quarterly 11 (1963). Our analysis of the decisions convinces us that many courts, even though they purport to apply a "majority rule" or a "minority rule," actually base their decision upon the facts relating to the division of functions between the insurer and the employer-policyholder, and that any "majority" or "minority" rule is more apparent than real. It is more correct to say that when the plan is exclusively administered by the insurer, as a matter of law no agency relationship exists between the insurer and the employer. But if the employer performs all of the administration of the policy, an agency relationship exists between the insurer and the employer, as a matter of law. Between these two extremes, as the division of functions becomes less separate, or to put it another way, as the employer assumes responsibility for more administrative or sales functions which are customarily performed by an insurer, a question of fact will arise as to the agency relationship between the insurer and the employer. A comparison of two decisions illustrates the point.

*Elfstrom v. New York Life Ins. Co.,* 67 Cal 2d 503, 63 Cal Rptr 35, 432 P2d 731 (1967), is often cited as representing the minority view. In that case, one Elfstrom was the president and majority stockholder of a corporation. His daughter, a student, had worked for the corporation on a part-time basis. Before leaving on an extended trip, Elfstrom instructed his bookkeeper, Mrs. Still, "to be sure that Brenda was covered." Brenda was then going to college. At the request of Mrs. Still, Brenda signed an

enrollment card, Mrs. Still filled in the blanks, and reported to the defendant that Brenda was added as an insured under the group policy.

One of the eligibility requirements of the defendant's policy was that the employee work at least 32 hours a week, and that the employee had completed six months of continuous employment as an eligible employee. Brenda met neither requirement, but she was unaware of any attempt to misrepresent her status to the insurer.

Shortly thereafter, Brenda died of aplastic anemia, and the defendant denied coverage. Her beneficiaries sued the insurer, claiming that Mrs. Still was the insurer's agent. The opinion of the California Supreme Court contains an extensive discussion of the growth and development of group insurance, the purposes of group insurance, and the administration of group insurance. The opinion described employer-administered plans and insurer-administered plans as follows:

"The administration of a group policy may be handled either by the insurer itself on the basis of information furnished to it by the employer or, as in the present case, by the employer. If the insurer administers the policy, the employer periodically submits to the insurer the names of its employees and other information relevant to coverage. The preparation of accounting records and changes of beneficiary, as well as other details are handled in the insurer's offices. Ordinarily, an employee who becomes eligible for insurance is required to sign an acceptance card authorizing payroll deductions and indicating his choice of beneficiary. The company then sets up an accounting record for the employee and prepares his certificate of insurance. Other duties of administration include the termination of an employee's insurance upon notice from the employer, adjustment of benefits and premiums as the employee's classification changes, and the recording of changes of beneficiaries. [Citing authorities.]

"Under an employer-administered plan the employer performs these functions, sometimes resulting in a saving in premiums. The only records regularly exchanged between the employer and the insurer are those pertaining to the calculation and payment of premiums, usually in terms of the number of lives insured, the amount of insurance in force, and specification of changes. These functions are performed by the employer under the direction of the

insurance company, which ordinarily provides service visits by a representative to check on the administration of the plan, examine the employer's records, lend assistance to the employer in improving administrative practices, and promote the enrollment of additional employees in the plan. [Citing authorities.]" 432 P2d at 735-736.

Justice Mosk, the writer of the opinion, referred to the two lines of authority, stating that they were hopelessly in conflict (432 P2d at 736). The court held, as a matter of law, that the employer was the agent of the insurer in administering the group insurance policy because the employer performed virtually all of the tasks incident to the administration of the policy, under the supervision of the insurer. As to the defendant's assertion that the employer was the agent of the employee, the court said:

"The most persuasive rationale for adopting the view that the employer acts as the agent of the insurer, however, is that the employee has no knowledge of or control over the employer's actions in handling the policy or its administration. An agency relationship is based upon consent by one person that another shall act in his behalf and be subject to his control. (Edwards v. Freeman (1949) 34 Cal 2d 589, 592, 212 P2d 883.) It is clear from the evidence regarding procedural techniques here that the insurer-employer relationship meets this agency test with regard to the administration of the policy, whereas that between the employer and its employees fails to reflect true agency. The insurer directs the performance of the employer's administrative acts, and if these duties are not undertaken properly the insurer is in a position to exercise more constricted control over the employer's conduct." 432 P2d at 738. (Footnotes omitted.)

The case cited by the Court of Appeals, *Bowes v. Lakeside Industries, Inc.,* 297 Minn 86, 209 NW2d 900 (1973), typifies the type of case often cited as representative of the majority rule. In that case one Bowes was the employer's (Lakeside) national sales manager. During the period of time he was so employed, he was covered by the company's group health and life insurance program issued by the defendant California Life Insurance Company. Bowes left the company to form his own company to act as sales representatives for 19 toy manufacturers, including his previous employer.

The group life insurance issued by California Life to Lakeside required, as a condition of eligibility, that the employee be a "full-time employee." When Bowes left Lakeside, he said he wished to continue his insurance coverage. Lakeside's personnel director agreed that there was still a close relationship, and that there would be "no problem in continuing his coverage so long as he [Bowes] was willing to pay the full amount of the premiums." 209 NW2d at 901. Bowes did so, thereafter died, and California Life refused to pay benefits to Bowes' widow.

The plaintiff sued California Life, contending that Lakeside was its agent to administer the group policy, and was therefore bound by Lakeside's declaration that Bowes was eligible for coverage. As to this, the Minnesota court held:

"* * * We are aware of a developing trend, best exemplified by Elfstrom v. New York Life Ins. Co., 67 Cal 2d 503, 63 Cal Rptr 35, 432 P 2d 731 (1967), recognizing that group insurance policies may be employer-administered as distinguished from insurer-administered, in which case the employer may be deemed to act as agent for the insurer. The instant case, however, does not invite adoption or adaptation of the Elfstrom doctrine. The insurance policy considered in Elfstrom was deemed 'employer-administered' because the insurer had delegated extensive duties to the employer, including enrolling employees, adding and deleting dependents, terminating and reinstating insurance, reporting details of coverage, indicating the amounts of premiums paid, issuing certificates of insurance, and determining eligibility for coverage. The California Life-Lakeside policy, as the trial court in effect found, was 'insurer-administered' because Lakeside, the named 'policyholder,' had only the limited function of supplying data as to the persons within the insured group and remitting premiums for their coverage. Lakeside's records were subject to examination by the insurer, and all other records were maintained by the insurer.

"The crucial determination made by the employer in Elfstrom was that an unquestioned employee was 'full-time' within the meaning of the policy arrangements. The more basic question in the instant case was whether the so-called employee was an employee at all. Lakeside's action in undertaking to accommodate Bowes' desire for continuance of inexpensive group life insurance benefits was

contrary to the plain terms of the policy *and patently adverse to the interests of the insurer which the asserted agent is supposed to represent.* Important to both the contractual claim against California Life and the fraud claim against Lakeside is the found fact that both Bowes and Segal of Lakeside understood, as well they should, that Bowes' insurable status was doubtful and that the insurer, not the insured, would ultimately make the determination." (Footnote omitted; emphasis added.) 209 NW2d at 901-902.

The Minnesota court held, as a matter of law, that the employer was not the agent of the carrier because the program was "insurer-administered," and because the employer "* * * had only the limited function of supplying data * * * and remitting premiums." 209 NW2d at 902.

It appears to us that *Elfstrom* and *Bowes* are neither inconsistent with each other nor do they reflect the application of different rules. Rather, they reflect the application of this rule: In the performance of a function delegated by the insurer to the employer, the employer is deemed to be the agent of the insurer.

In *Bowes,* the insurer was held not liable because the employer's designated responsibilities did not include the determination of coverage of employees. In *Elfstrom,* however, the court held the insurer liable because the employer had been expressly charged with the performance of the function of enrolling eligible employees "* * * under the direction of an agent of [the insurer]." 432 P2d at 736.

The essence of the plaintiff's claim herein is that Largent told him that he had six months within which to qualify for coverage for himself and his dependents without proof of insurability; that he relied upon Largent's statements and deferred filing his application for coverage; that had he known the true facts, he would have applied for and been issued coverage for himself and his dependents without proof of insurability, which insurance would have been in effect at the time of his daughter's illness.

In the normal two-party insurance transaction, the insurer performs a variety of tasks such as solicitation of the insured, which often includes discussions with the potential insured as to cost of coverage, the benefits, the

exclusions, insurability, and other aspects of the insurance policy; the delivery of an application for insurance, sometimes involving assistance with the preparation of the application itself; the processing of the application; the issuance of the insurance policy or certificate of insurance; collecting premiums; and processing claims, including the delivery of claim forms and the handling of the claim after receipt.

By the defendant's express admission in its brochure, some of these tasks were to be performed by the employer, including the receipt and remittance of contributions for the program, and maintenance of records of all insured employees and dependents. Although the contract between the insurer and the employer is silent as to such things as enrollment forms, claim forms, and the like, there is evidence that the insurer expected the employer to distribute application forms to the employees, to receive and forward the application forms to the carrier, and to deliver claim forms to the employees. In this case, when the carrier wrote to the employer regarding the plaintiff's coverage, the insurer relied upon the employer to assist in obtaining evidence of insurability.

The policy itself contains provisions respecting the employer's responsibility, which include periodically furnishing "such information relative to individuals becoming insured * * * as the company may require for the administration of the insurance under this policy." In addition, the policy expressly provides that the insurer remains liable for the employer's errors, in specified respects.

The plaintiff asserts that there is evidence to support a finding that the employer was the agent of the insurer for other purposes, as well—that if the employer is given the responsibility to deliver application forms to the employees, it is not unlikely that the employee might have questions as to the coverage, particularly when the brochure was not given to the employee at the time the application was delivered. We agree. The trier of fact could well find that the employee reasonably believed that the employer was authorized to answer such questions. See Restatement of Agency (Second) 32, § 8, and *Elfstrom v.*

*New York Life Ins. Co., supra,* 432 P2d at 738.[3] We very much doubt that the insurer would deny that the employer had no right to correctly answer questions regarding the coverage. If true representations are within the employer's authority or apparent authority, in the absence of notice to the employee, the trier of fact could hold the insurer responsible for innocent misrepresentations made by the employer, such as were apparently made in this case. Restatement of Agency (Second) 384, § 162.

■        In *Beeson v. Hegstad,* 199 Or 325, 330, 261 P2d 381 (1953), it is stated that "[i]t is elementary that express authority given an agent to do certain things carries with it the implied authority to do all other things reasonably incident to and necessary for carrying out the objectives of the agency." The evidence shows that the employer had express authority to perform specified acts, and the defendant, in its policy, expressly made itself liable for the employer's failure to perform some of those acts. In addition, the evidence shows that the employer had other responsibilities in the administration of the program. If an employer is charged with the performance of functions incident to the administration or sales of insurance which are commonly performed by the insurer, it is proper to say that the employer is the insurer's agent for those purposes. If there are other functions for which the employer has no responsibility it is equally logical to say that the employer is not the insurer's agent for those purposes.

Here there is evidence, both direct and indirect, that the employer performed some functions incident to the initiation of coverage by employees, which duties included the distribution, receipt and forwarding of applications for

---

[3] Compare this language from *Elfstrom v. New York Life Ins. Co.,* 67 Cal 2d 503, 63 Cal Rptr 35, 432 P2d 731, 738 (1967):

"The most persuasive rationale for adopting the view that the employer acts as the agent of the insurer, however, is that the employee has no knowledge of or control over the employer's actions in handling the policy or its administration. An agency relationship is based upon consent by one person that another shall act in his behalf and be subject to his control. * * *

"* * * Nevertheless, it would be inconsistent with the actual relationship of the parties and would do violence to the traditional concept of agency to hold that the employees rather than the insurer control and direct the employer's acts in administering a policy of group insurance. * * *"

insurance and was expressly charged by the insurer with responsibility for "* * * [furnishing] to the Company * * * information relative to individuals becoming insured * * *." Specific limitations on the employer's duties and responsibilities are not set forth in the policy.

■ We cannot say, as a matter of law, that the authority to distribute enrollment forms, applications, and claim forms did not carry with it the implied authority to answer questions regarding deadlines for filing such forms. Nor can we say, as a matter of law, that it was unreasonable for the plaintiff to look to Mr. Largent for such information. The trial court erred in directing a verdict for defendant.[4]

## ESTOPPEL

The defendant's final assertion is that "[e]ven if plaintiff's employer were defendant's agent, plaintiff cannot rely on the doctrine of estoppel to create a contract of coverage. * * * Although the master policy had been issued by defendant to plaintiff's employer, no contract of coverage ever existed between plaintiff and defendant. Therefore, plaintiff cannot rely on the doctrine of estoppel to create coverage."

■ Defendant is correct in the assertion that there are limitations as to the extent to which insurance coverage can be *created* by estoppel. The rules are set forth in *Wyoming Sawmills, Inc. v. Transportation Insurance Co.*, 282 Or 401, 578 P2d 1253 (1978), and *Schaffer v. Mill Owners Insurance Co.*, 242 Or 150, 156, 407 P2d 614 (1965). Both cases involved conduct of insurance companies after losses had occurred. Both cases stand for the proposition that (quoting from *Wyoming Sawmills, supra*, 282 Or at 410):

> "* * * Waiver or estoppel cannot be the basis for creating an original grant of coverage where no such contract previously existed. *Schaffer v. Mill Owners Ins. Co.*, 242 Or 150, 156, 407 P2d 614 (1965). * * *"

More specifically, both cases stand for the proposition that if, after loss has occurred, an insurer erroneously denies

---

[4] Whether the employer would be the insurer's agent in answering technical questions as to the nature or extent of coverage is not involved in this case. The insurer, by appropriate language on the application form, may be able to restrict its potential liability for unauthorized statements of others.

coverage on the basis of an exclusion, such erroneous denial does not have the effect of creating coverage beyond the terms of the insuring clauses of the policy.

■     The plaintiff's claim in this case is unlike either *Schaffer* or *Wyoming Sawmills.* In both of those cases the agreement was struck and the policy was issued. The issue was whether an insurer's conduct after the loss could create coverage by estoppel where there was no coverage under the agreement. In neither case could the insured show any prejudice or change of position after the loss, by virtue of the insurer's conduct. Here, the plaintiff is able to show that all the requirements of estoppel have been met and (there being evidence to support his agency claim) that the policy was in effect upon the filing of the application for coverage within the time specified by the defendant's alleged agent. Although it is true that the policy provided that proof of insurability could be required if enrollment were more than 31 days after the initial date of employment, there is no question that plaintiff would have received the very coverage he claims entitlement to herein had he enrolled within 31 days by completing an application and (quoting the defendant's brochure) "[returning] it to [his] supervisor." There is evidence from which the trier of fact could find that (1) a false representation (albeit an innocent one) was made (2) by someone having knowledge of the facts to (3) one who was ignorant of the truth, (4) that the statement was made with the intention that it be acted upon by the plaintiff and (5) that plaintiff acted upon it. *Donahoe v. Eugene Planing Mill,* 252 Or 543, 545, 450 P2d 762 (1969).

There is evidence that the plaintiff was entitled to virtually automatic coverage without proof of insurability if application was made within 31 days and that but for Largent's statement such coverage would have been in effect at the time the loss occurred. As early as *Hardwick v. State Insurance Co.,* 23 Or 290, 292, 31 P 656 (1892), we suggested that an oral contract of insurance would be presumed to contain the terms and conditions usually inserted by defendant in its policies of insurance in like cases. There is little question that if the plaintiff had enrolled in a timely fashion (as he testified he would have,

but for Largent's statement), the coverage would have been in effect.

If the trier of fact finds that Largent made the statements attributed to him while acting as the defendant's agent, such conduct would estop the insurer from asserting that no coverage existed because the application was not timely filed.

Our conclusion is fortified, at least in part, by the dissimilarity between the facts of this case and *Bowes* or *Elfstrom.* In *Bowes,* the Minnesota court was careful to point out that the conduct of the employer was "patently adverse to the interests of the insurer which the asserted agent is supposed to represent." 209 NW2d at 902. In *Elfstrom,* the California court, after finding an agency relationship between the employer and the company, remanded for determination whether the employer acted fraudulently in procuring the policy. 432 P2d at 740. This is no such case.

The employer's conduct in this case was not fraudulent, not intended to create coverage where a right to coverage did not exist, and was neither thought to be nor intended to be adverse to the insurer. This is not a situation, as in *Bowes, supra,* where the employer and the employee were in cahoots in attempting to get coverage for an employee who was otherwise not eligible. In this case, the employee clearly met the eligibility requirements, and but for the mistaken representation made by his employer, the plaintiff might have seasonably obtained the coverage, thus avoiding this dispute.

### APPLICABILITY OF ORS 744.165

This case must be remanded for a new trial. One of the issues that will arise on retrial will be the application of ORS 744.165, which reads:

> "Any person who solicits or procures an application for insurance shall in all matters relating to such application for insurance and the policy issued in consequence thereof be regarded as the agent of the insurer issuing the policy and not the agent of the insured. * * *"

Plaintiff urges that Largent, in making the statements attributed to him, was either soliciting or procuring for

insurance and that his statements bind the defendant, as a matter of law.

ORS 744.165 is contained in a chapter of the Insurance Code entitled "Agents and Solicitors." Most of the subsections in this chapter pertain specifically to licensing. In fact, in the portion of the chapter concerning "Agents Generally" (ORS 744.005-.215), the only provision that does not specifically mention licensing is ORS 744.165. Nevertheless, the legislative history of this provision indicates that it was not originally enacted as a licensing provision.

ORS 744.165 can be traced directly back to 1917, when the Legislative Assembly adopted Oregon's first comprehensive insurance code. Or Laws 1917, ch 203, at 312-400. Chapter 203 included many general provisions relating to insurance companies, as well as separate regulations concerning fire insurance, mutual fire insurance, and life insurance. The statute contained the following general provision defining "agents" and detailing the requirements for their licensing:

> "*The Word 'Agent' in This Act.* (1) The word 'agent' in this Act, wherever used, shall be construed to include and apply to * * * any person who solicits insurance, receives an application or order to write, renew or procure any policy or collect any premium * * *."

Or Laws 1917, ch 203, § 4-a(1). Subsequent sections required each "agent" to procure a license from the Commissioner and allowed for revocation of such license under certain conditions. These licensing provisions can be traced back to an 1899 law that required the licensing of "any person who solicits insurance, receives an application or order to write, renew or procure any policy." Or Laws 1899 at 187, § 6.

The 1917 law specifically exempted life insurance agents from these licensing requirements, however. A separate provision for life insurance agents required that:

> "Every life insurance company doing business in this State shall give written notice to the Insurance Commissioner of the name and residence of, and obtain from him a license for every person appointed by it to act as its agent within this State * * *."

Or Laws 1917, ch 203, § 24-d(1). The provision similar to the one at issue herein appeared in a subsequent subsection of the provisions for life insurance companies:

> "Section 24-n. *When Solicitor Agent of Company.* Any person who shall solicit and procure an application for life insurance shall, in all matters relating to such application for insurance and the policy issued in consequence thereof, be regarded as the agent of the company issuing the policy and not the agent of the insured, and all provisions in the application and policy to the contrary are void and of no effect whatever."

In this form, the provision obviously pertained to something other than licensing. Licensing was already provided for in section 24-d(1); and further, section 24-n apparently applied to a broader group of people than section 24-d(1), since 24-d(1) applied only to persons "appointed by" the insurance company, while 24-n applied to "any person" who solicited or procured insurance. Unfortunately, there is no legislative history to further explain the purpose of section 24-n.

The provision enacted as section 24-n in 1917 remained intact until 1967. During that time the provision was always codified in the "life insurance" chapter of the Insurance Code. Or Laws 1920, § 6435; Oregon Code 1930, § 46-515; OCLA 1940, § 101-515; ORS 739.520. In 1967, this provision was moved from the "life insurance" chapter to a newly-created chapter containing all provisions relating to agents and adjusters. Or Laws 1967, ch 359, § 540 (codified as ORS 744.165). Provisions concerning agents and adjusters had previously been scattered in at least five chapters of the Insurance Code. One of the main reasons for the 1967 amendments was to effect a consolidation and reorganization of the code. Except for this change in statutory classification, however, the 1967 amendments retained virtually the same language that was adopted in 1917.[5] However, the provision still pertained only to life insurance — a result that may have been inadvertent since the provision was moved into a more general chapter. At all events, the word "life" was deleted from the provision in

---

[5] The 1967 amendments made two insignificant changes in language: the word "invalid" was substituted for the word "void" and the word "insurer" was substituted for the word "company." Or Laws 1967, ch 359, § 540.

1971. Or Laws 1971, ch 231, § 32. ORS 744.165 has not been changed since that time.

Statutes of a similar nature existed in many other states prior to Oregon's enactment of 1917. Some were basically criminal statutes,[6] while others were primarily for revenue-raising purposes.[7] Still others, however, appear to have been aimed at establishing a statutory standard of agency that could not be altered by an insurance policy or application. Early cases indicate the need for such legislation. Few states had licensing statutes and many did not regulate the relationship between agents and consumers. As the courts began to impose the law of agency on these relationships, the insurance companies responded with disclaimers aimed at negating this relationship by contract. The Court of Appeals for the Eighth Circuit explained this development as follows:

> "The courts long ago decided [to apply] to the relation between the insurance companies and their agents the well-settled rule of agency that all acts performed and all knowledge acquired by an agent in the conduct of the business of his agency are the acts and knowledge of the principal. After this doctrine had been established, the insurance companies, in order to evade it and escape liability for the acts and knowledge of their agents in the due prosecution of the business of their agencies, inserted in their applications and policies a provision to the effect that the persons soliciting or taking the application should be deemed the agent of the insured, and not of the insurer. * * *"

*New York Life Insurance Co. v. Russell,* 77 F 94, 105 (8th Cir 1896). Examples of such waivers abound in early case law.[8] The frustration that many judges had with these waivers is also apparent in many of these cases. A Pennsylvania court in 1865 described such a waiver as "very cunning."[9] A federal judge reasoned that because insurance

---

[6] *See, e.g.,* 1889 Ky Acts, ch 32, § 633.

[7] *See, e.g.,* 1884-85 Ala Acts, ch 1, § 16.

[8] *See, e.g., The Commercial Ins. Co. v. Ives,* 56 Ill 402 (1870); *Rowley v. The Empire Ins. Co.,* 36 NY 550 (1867); *Shawmut Mut. Fire Ins. Co. v. Stevens,* 91 Mass 332 (9 Allen) (1867).

[9] *The Columbia Insurance Co. v. Cooper,* 50 Pa 331 (1865).

agents, who were "paralyzed by the limitations on the scope of the agency," were "the only human organs through which the insurance company expresses itself to the mind of the insured," they should be held to be agents of the company, despite contractual provisions to the contrary.[10]

An examination of the codes of other states reveals that in 1880 Iowa adopted a provision almost identical to the one later adopted in Oregon. The 1880 Iowa session law, entitled "An Act Relating to Insurance and Fire Insurance Companies," provided that:

> "Any person who shall hereafter solicit insurance, or procure applications thereof, shall be held to be the soliciting agent of the insurance company or association issuing a policy on such application, or on a renewal thereof, anything in the application or policy notwithstanding."

1880 Iowa Acts, ch 211, § 1. While there is no legislative history of this statute, it seems quite likely that *Walker v. The Farmers Insurance Co.,* decided by the Iowa Supreme Court the year before this statute was enacted, was a major reason for its enactment. 51 Iowa 679, 2 NW 583 (1879). In *Walker,* the plaintiff made an application to the "agent" for fire insurance. The agent represented that the application and a promissory note constituted a contract of insurance and that plaintiff was in fact insured. The agent never forwarded the application to the insurer. On appeal to the Supreme Court of Iowa, the court held that no contract of insurance was made, that "* * * it was not shown that the agent was acting within the scope of his agency at the time. Indeed, it appears that he was not, for his powers as the agent were confined to taking applications for insurance. He had no other powers." 51 Iowa at 682.

The 1880 statute that was enacted immediately after this case was decided was construed by the Supreme Court of the United States in *Continental Life Insurance Co. v. Chamberlain,* 132 US 304, 10 S Ct 87, 33 L Ed 341 (1889). This case involved truthful representations made by the plaintiff to an "agent" who helped prepare an "application" which contained errors as to the existence of other

---

[10] *Merchants' Life Ass'n v. Yoakum,* 98 F 251, 269 (5th Cir 1889). *Accord, Schomer and another v. The Heckla Fire Ins. Co.,* 50 Wis 575, 583, 7 NW 544, 547 (1880).

insurance. The application purported to reserve to the officers of the home office all authority to officially represent the company, and also provided that "no * * * representations made or given to the person soliciting this application for a policy of insurance shall be binding on the * * * company." The Supreme Court held that the Iowa statute governed, reasoning that

> "* * * [The statute] dispenses with any inquiry as to whether the application or the policy, either expressly or by necessary implication, made Boak the agent of the assured in taking such application. By force of the statute, he was the agent of the company in soliciting and procuring the application." 132 US at 310.

This Iowa statute clearly influenced legislation in a number of other states. Nebraska adopted a statute in 1885 that was modeled after the Iowa statute. 1885 Neb Laws, ch 23, § 5, discussed in *New York Life Insurance Co. v. Russell,* 77 F 94 (8th Cir 1896). Arkansas adopted a statute in 1895 that, according to the Arkansas Supreme Court, "was borrowed from a statute passed in the state of Iowa in 1880." *Connecticut General Life Insurance Co. v. Speer,* 185 Ark 615, 48 SW2d 553 (1932) (applying Crawford & Moses' Dig. § 6061, 6063). An Arkansas circuit court had held earlier in *Burlington Insurance Co. v. Kennerly,* 60 Ark 532, 31 SW 155 (1895) that

> "[t]he acts and declarations of Sumpter & Son, even if [they] were the local agents, could not, by the terms of the policy, bind the company by any waiver, and, therefore, their explanations or advice upon the subject were immaterial."

It seems quite likely that the Oregon provision was borrowed from one of these states. The kind of waiver provisions contained in the insurance applications at issue in the cases mentioned above were definitely being used in Oregon before 1917. In fact, the Oregon Supreme Court in 1916 invoked an estoppel theory to overrule the defense of an insurance company that claimed that the plaintiff could not, under the terms of the policy, rely on the agent's representations as to the time limits for filing an action. *Kimball v. Horticultural Fire Relief,* 79 Or 133, 154 P 578 (1916).

ORS 744.165 and its predecessors have been mentioned in only a few Oregon cases.[11] The Supreme Court of the United States interpreted the statute in *Stipcich v. Insurance Co.,* 277 US 311, 48 S Ct 512, 72 L Ed 895 (1928), a case in which there was no doubt that the solicitor was an official agent of the insurance company. In *Stipcich,* the decedent advised the soliciting agent of an ulcer condition, but the agent did not advise the company. The insurance company denied the death benefits claim on the ground that the decedent failed to reveal his health condition to the company. The policy contained the following clause: "* * * no agent, medical examiner, or any other person except the Officers at the Home Office of the Company, have the power on behalf of the Company; (a) to make, modify or discharge any contract of insurance, (b) to bind the Company by making any promises respecting any benefits under any policy issued hereunder". The Court concluded that Or Laws, § 6435 (1920) (now ORS 744.165) was controlling over this term in the policy, reasoning that:

"* * * Here the statute does more than provide that the soliciting agent in matters relating to the application and policy does not represent the insured. In connection with those matters it makes him the agent of the company, a phrase which would be meaningless unless the statute when applied to the facts of the case indicated in what respects he represented the company. Here the statute in terms defines the scope of his agency to the extent that he is stated to represent the company 'in all matters relating to the application and the policy issued in consequence' of it. We need not inquire what are the outer limits of that authority, but we think this language plainly makes him the representative of the company in connection with all those matters which, in the usual course of effecting insurance, are identified to the application and delivery of the policy." 277 US at 320-321.

Whether this statutory provision, which exists in virtually the same form today, creates a similar relationship in the case at bar is, to be sure, a more difficult question. In all cases involving the provision now codified

---

[11] *See, State Farm Fire & Cas. Co. v. Sevier,* 272 Or 278, 297, 537 P2d 88 (1975); *Hayes Truck Lines, Inc. v. Investors Ins. Corp.,* 269 Or 565, 572, 525 P2d 1289 (1974); *Bunn v. Monarch Life Ins. Co.,* 257 Or 409, 416, 478 P2d 363 (1971).

as ORS 744.165, the question has been whether the application or the insurance policy can limit the authority of an otherwise officially licensed or designated agent. The cases in this area have supported the conclusion, clearly spelled out in the statute, that neither the policy nor the application can limit the existing agency relationship. Whether this provision can *create* an agency relationship that was not already officially established through the licensing process is a more difficult question. When the predecessor statute to ORS 744.165 was enacted in 1917, little or no group insurance was in effect. The goal the statute aimed to achieve was to bind insurers for the acts of those persons who were involved in the insurance business, including but not limited to licensed agents, as regards the soliciting and procuring of applications for insurance policies. As early as 1889, the Illinois court, in construing a similar statute, stated:

> "* * * The manifest intention was, to make such companies responsible for the acts not only of its acknowledged agents, etc., but also of all other persons who in any manner aid in the transaction of their insurance business." *Continental Ins. Co. v. Ruckman,* 127 Ill 364, 378, 20 NE 77, 81 (1889); *accord: Schomer and another v. The Heckla Fire Ins. Co.,* 50 Wis 575, 583, 7 NW 544, 547 (1880).

We believe that ORS 744.165 should be construed consistent with the objective for which it was enacted, and that independently of common law tests of agency it sets the policy of this state toward the position of intermediaries in the sale of insurance. The distribution of insurance coverage to large groups of individuals through an employer or other central entity may not have been known to the legislators who enacted the statute, but that does not make the statute inapplicable.

It has long been recognized that group insurance, sold in the form of a single master contract with an entity other than the persons actually to be insured, departs from the older form of sale of individual policies in ways that *create* novel problems. One early suggestion was that when an insurer takes advantage of this functionally distinct and efficient system of distribution, instead of offering its policies by means of direct contacts with individual consumers and in competition with those of other insurers,

legal analysis should follow these functional distinctions rather than conventional agency law in allocating responsibility and risk among the parties to group insurance. *See* Hanft, *Group Life Insurance: Its Legal Aspects,* 2 Law & Contemp Prob 70, 86 (1935).[12] But such an analysis in this case need not take us beyond the long-established public policy of ORS 744.165.

■     As quoted above, the statute makes the person who solicits or procures an application for insurance the agent of the insurer "in all matters relating to such application for insurance." As also stated above, the statute does not presuppose that the person who solicits or procures the application would be anyone's agent apart from the statute. The consequences of agency for the insurer issuing the policy[13] follow from ORS 744.165 whenever the intermediary is placed in the position of soliciting or procuring an application for insurance. When an employer or other master policyholder is the intermediary in marketing insurance to a group of persons who are invited to subscribe to or to reject coverage, individually, under the master policy, statements made to such persons "relating to such application for insurance" are to "be regarded" as those of

---

[12] Hanft, *Group Life Insurance: Its Legal Aspects,* 2 Law & Contemp Prob 70, 72-73 (1935).

"Something is gained, therefore, by the fact that group insurance has at hand a body of law developed and ready to be applied to it. But there is danger in this. Here is a new device, capable of great usefulness. The danger lies in thrusting the new device into an old category called 'insurance' and subjecting it out of hand to all the law gathered about the category. The judicial habit of putting a transaction into a category, and then subjecting it to the law of the category, has drawbacks at best. When the form of transaction is of a new type, widely used and susceptible of still greater use, the category to which it belongs should be subordinate to the inherent nature of the device itself in determining the law which shall govern it. If group insurance had been called 'skeepjix,' or some other name equally remote from the name of any known thing hitherto existing, perhaps attention would have been directed to its own nature, and perhaps more consideration would have been given to making the law fit and develop the newly created device. Group insurance, in short, should be regarded as *sui generis,* and in dealing with its peculiar problems the law should be concerned first and foremost with developing this social agency to its maximum usefulness, and in insuring justice in its operation. It should not be clad in the straightjacket of legal rules made before it existed. * * *"

[13] We do not think identification of the insurer "issuing the policy," for purposes of the statute, is affected by the fact that the master policy exists prior to the individual application for coverage and no new policy is issued to the individual. Coverage exists only insofar as individuals subscribe to it and in that sense follows or is "issued" upon the application.

an agent for the insurer if it can be said that the master policyholder "solicits or procures" the individual's application.

■    This question, whether the intermediary has made a statement in the context of "soliciting or procuring" an individual's application for coverage under a group insurance contract, can give rise to issues of fact unless the undisputed evidence leads to a single conclusion as a matter of law. Neither "solicits" nor "procures" is further defined in the statute. "Solicits" clearly includes the kind of activities normally engaged in by a person proposing that another person subscribe to an insurance policy and includes such meanings as: invites, requests, urges, advises, endeavors to obtain, approaches or asks for the purpose of receiving. *Compare Phillips v. City of Bend,* 192 Or 143, 154, 234 P2d 572 (1951). The inclusion of the second term, "procures," must be understood to add something beyond a duplication of "solicits"; we believe that it covers one who in fact receives, obtains, acquires, or participates in effecting an application for insurance coverage whether or not he or she affirmatively sought to "solicit" it.[14] Thus, at one extreme, if an employer distributed to his employees materials urging them to take advantage of the company's group insurance plan and advising them to complete and submit applications furnished them for this purpose, the employer's statements "relating to such applications for insurance" would be regarded as those of an agent for the insurer as a matter of law. At the other extreme, a casual statement about the process or time of applying for coverage made by a fellow employee with no apparent authority to speak for the employer or made at a time and in a setting remote from any pending choice to accept or reject coverage would not be so regarded. Between these extremes there is room for many situations in which it is a factual issue whether a representative of the employer offered an explanation of the application process at a time and under circumstances when this could reasonably be expected to be understood by the representative and by a potential applicant as information bearing on the choice whether, when, or how to apply, so as to qualify as "soliciting" or "procuring" under the statute.

---

[14] *See Penn v. Barrett,* 273 Or 471, 476, 541 P2d 1282 (1975).

We therefore turn to a detailed examination of the facts to determine whether, as a matter of law, Largent, in his discussion with the plaintiff, was soliciting or procuring an application for insurance.[15]

The testimony concerning the conversation between plaintiff and Mr. Largent is sparse. Largent's testimony is inconclusive. He testified:

"Q. Now do you know if you discussed this with Mr. Paulson, you told him about this period of eligibility?

"A. I can't swear that I did but I don't — I don't know why I would not have. It was just — There was nothing special about it one way or the other in my mind, nothing to conceal or nothing to promise."

Paulson's testimony is somewhat more definite. He recalled:

"Q. When you went to work for Roof & Floor, did you have any medical insurance in force for yourself and your family?

"A. Yes.

"Q. And who was that with?

"A. OPS.

"Q. And how long at least did you understand that you had coverage for?

"A. The end of October — first of October, I think it was.

"Q. Now when you came to work for Roof & Floor, did you inquire of any health insurance plans that they offered on the job?

"A. Yes.

"Q. And when did you talk — when did you inquire about these plans?

"A. Oh, I think when I was first talking to Mr. Largent about going to work there.

"Q. You said Mr. Largent. Did you talk to anybody else?

"A. No.

"Q. Now prior to the time that you became employed did you ever see an insurance policy or brochure or anything else?

---

[15] In doing so, we examine the evidence in the light most favorable to the defendant, the party against whom the plaintiff's motion for a peremptory finding was made. See footnote 1, above.

"A. No.

"Q. And did you discuss both your eligibility and the eligibility of your family for health insurance under this plan?

"A. Yes.

"* * * * *

"So were you concerned about having coverage at all times?

"A. Yes.

"Q. Now when you discussed this with Mr. Largent, what did he tell you about the eligibility for yourself and your family?

"A. He told me we could go on it anytime in the first six months.

"Q. And be any evidence of insurability required if you signed up?

"A. No.

"Q. And with that in mind and your other coverage, what did you decide to do?

"A. Well, decided to just keep our OPS until it ran out. It was paid up, and then look before it ran out, I put in for coverage on this.

"Q. Now, if you would have known that you would have had to sign up within 30 days, would you have signed up yourself and your dependents under the Roof & Floor plan?

"A. Yes.

"Q. Handing you Exhibits 1 through 5, and turning to Exhibit 1, it has already been received, but that is the application that you submitted for your coverage, is that correct?

"A. Yes.

"Q. And did you get that from Mr. Largent, or the company?

"A. I got it from somebody there; I couldn't tell you who at the time."

Largent did not deny the plaintiff's version.

The evidence does not compel the conclusion that Largent was an agent as a matter of law; nor does the evidence compel the contrary conclusion, as a matter of law. Although the question is a close one, we think that the determination of whether Largent was soliciting or procuring an application for insurance is a question for the jury.

If the jury finds that the conversation occurred as recounted by the plaintiff, and that persons in the position of Largent and the plaintiff could reasonably conclude that at that time Largent was advising plaintiff or otherwise participating in effecting an application for insurance by providing information to the plaintiff relating to plaintiff's decision as to whether, when, or how he would apply for coverage, Largent would have solicited or procured an application for insurance within the meaning of ORS 744.165. We therefore reverse and remand for trial on both issues, one relating to Largent's status under the statute, the other relating to plaintiff's common law agency claim.

Reversed and remanded to the trial court for trial.

Tanzer, J., filed a dissenting opinion.

**TANZER, J.,** dissenting.

I regret that I cannot join in the majority opinion. The rule of law which it propounds is unrealistic: a group insurer can be legally bound by the statements of the employer if it is possible that the employer will answer questions about coverage. Also, the majority evades the task of statutory construction by letting the jury do it.

I

First, the opinion identifies the applicable law as a dichotomy composed of so-called "insurer-administered" and "employer-administered" group insurance plans, cites cases involving each, and summarizes the law as this:

"* * * [W]hen the plan is exclusively administered by the insurer, as a matter of law no agency relationship exists between the insurer and the employer. But if the employer performs all of the administration of the policy, an agency relationship exists between the insurer and the employer, as a matter of law. * * *" 292 Or at 44.

This seems to be a satisfactory legal rationale upon which insurers, employers and employees can conduct their affairs and, for purposes of this dissent, I do not dispute it. The opinion also sets out the facts of this case which parallel in all significant respects those in the "insurer-administered" cases it cites. It then concludes, inexplicably,

that the plan in this case can be found to be an "employer-administered" plan. The only reason it offers is that the insurer might have expected the employer to answer questions about deadlines, but that inference is equally possible in each of the very cases which the majority cites as "insurer-administered" cases. One need not be first in the class to see the fallacy. Hence, I disagree with the agency analysis.

## II

The discussion of ORS 744.165 is inconclusive. On these facts, the employer is either an agent under the statute or it is not, depending on the meaning of the statute. Statutory construction is a process of law, not fact-finding. Whether a particular kind of situation falls within or without the meaning of a statute is a definitional determination of law to be made by courts. When the words of a statute are clear, that legal task is simple. Where the words are not clear, the task is not so simple, but courts customarily look to the context of the words, the legislative history, rules of construction or other extrinsic aids to determine the underlying legislative intent. The majority goes through those motions, but does not follow through to a conclusion. Instead, it shucks the question to the jury.

Our function as an appellate court goes beyond individual case decision. Our responsibility regarding ORS 744.165 is to clarify its meaning so that insurers and others affected by it can conduct their affairs knowing the rules which apply. In this way, lawyers can understand the scope of the statute and advise clients accurately. If we perform our responsibility of statutory construction, people can come to secure, predictable business arrangements, thus avoiding needless disputes. When disputes arise, they can more often be settled without litigation if the law is clear. If we fail to clarify the meaning and application of the statute, as the majority does, and instead send the problem to the jury without clarifying instructions, business arrangements become speculative, the law becomes a matter of jury prediction, and people affected by the statute never know their rights and liabilities until a verdict is obtained. This philosophy of judicial function is fundamental, but the majority seems not to acknowledge it.

ORS 744.165 should be construed to achieve its purpose. The majority has gone to the work of determining the purpose of the statute, but then fails unaccountably to apply the conclusion it draws from the statutory history. The majority states:

> "* * * Whether this provision can *create* an agency relationship that was not already officially established through the licensing process is a more difficult question. When the predecessor statute to ORS 744.165 was enacted in 1917, little or no group insurance was in effect. *The goal the statute aimed to achieve was to bind insurers for the acts of those persons who were involved in the insurance business, including but not limited to licensed agents, as regards the soliciting and procuring of applications for insurance policies. * * *"* (Second emphasis supplied; 292 Or at 60.)

The majority goes on to hold that an agency may or may not be created according to how the jury decides, not by legal operation of the statute.

The facts of the conversation between plaintiff and Largent do not call the statutory purpose into play. The conversation occurred prior to plaintiff's employment, "when I was first talking to Mr. Largent about going to work there." The record is clear that: At the time of the meeting the conversation was incident to possible employment of the plaintiff by Largent. Plaintiff had not yet made the decision to go to work for Largent. Plaintiff had not yet made the decision to apply for coverage. There was no delivery of any application. There was no discussion concerning any application. The application was obtained months later from "someone there at the company." At the time of the conversation Largent was not advised whether plaintiff intended to apply for coverage, and there is no evidence that Largent cared, one way or the other, whether plaintiff applied for coverage.

Given that statutory purpose and those facts, the majority refuses to face up to the conclusion that ORS 744.165 does not apply (or, for that matter, does apply). We should decide whether the employer's conduct was procuring or solicitation of an application for insurance within the meaning of ORS 744.165 or was not. Instead, the majority concludes inconclusively by sending the issue to the jury.

## III

I conclude that ORS 744.165 embodies some basic agency principles, but under the rationale of *Bowes v. Lakeside Industries, Inc.,* 297 Minn 86, 209 NW2d 900 (1973), and *Elfstrom v. New York Life Ins. Co.,* 67 Cal 2d 503, 63 Cal Rptr 35, 432 P2d 731 (1967), this is an insurer-administered plan and the employer (policyholder) does not have authority as agent to bind the insurer by making statements at variance with the policy. Petitioner may have a claim against the employer for misrepresentation, or perhaps breach of contract, but not against the insurer based on the agency of the employer.