The PORT OF PORTLAND, a municipal corporation, Plaintiff,

v.

WATER QUALITY INSURANCE SYNDICATE, a foreign corporation, Defendant.

The PORT OF PORTLAND, a municipal corporation, Plaintiff,

v.

ST. PAUL FIRE & MARINE INSUR-ANCE COMPANY, a foreign corporation, Defendant.

Civ. Nos. 80–780–RE, 81–94–RE.

United States District Court, D. Oregon.

Oct. 7, 1982.

---

**234**

Paul N. Wonacott, Donald J. Morgan, Craig C. Murphy, Wood Tatum Mosser Brooke & Holden, Portland, Or., for plaintiff.

Alex L. Parks, C. Kent Roberts, Parks, Montague, Allen & Greif, Portland, Or., Sheldon E. Vogel, Thacher Proffitt & Wood, New York City, for defendant Water Quality Ins. Syndicate.

James M. Callahan, Landis, Aebi & Bailey, P.C., Portland, Or., for defendant St. Paul Fire & Marine Ins. Co.

## OPINION

REDDEN, Judge:

This is an action brought by the Port of Portland ("the Port") against two of its insurers, St. Paul Insurance ("St. Paul") and the Water Quality Insurance Syndicate ("WQIS"). A dredge owned by the Port, the OREGON, sank at its moorings and created a large oil slick on the Willamette River. The Port contracted with third parties to clean up the slick, and sought repayment from its insurers. The insurers deny coverage under their policies for a variety of reasons. The case is now before the court on cross motions for summary judgment on certain legal issues.

*Does the St. Paul Policy Cover the Loss in Question?*

The Port's insurance policy issued by St. Paul provided coverage for "property damage," which is defined as "physical injury to or destruction of tangible property." St. Paul contends that the pollution of the Willamette did not result in "property damage"; or that if it did, the policy contains an express exclusion, Exclusion K, which avoids coverage.

Exclusion K to the policy reads as follows:

[This Insuring Agreement does not apply:]

.　　.　　.　　.　　.

K.　To bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants, or pollutants into or upon land, the atmosphere *or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.* (Emphasis added.)

■ The normal rule that ambiguities must be resolved in favor of the insured is even stronger when, as here, an exclusionary clause is at issue. *Ins. Co. of North America v. Howard,* 679 F.2d 147, 150 (9th Cir. 1982) (Citing Oregon cases). However, in this case there is no ambiguity whatsoever about the terms of the policy, and its meaning is clear as a matter of law. Exclusion K itself states that "property damage" can result from the discharge of pollutants, and disallows coverage for certain types of pollution which result neither suddenly nor accidentally. There is no material issue of fact as to whether the sinking of the OREGON was sudden or accidental; the policy clearly covers such a loss. The insurer argues that the damage to the Willamette River was not "injury to or destruction of tangible property," but this interpretation is untenable. The language of Exclusion K itself disallows coverage for certain "property damage" resulting from discharge into navigable waters. Further, Oregon law es-

tablishes that the state's interest in its water resources is sufficient to support an action for damages caused by pollution, see *Askew v. American Waterways Operators,* 411 U.S. 325, 331–2, 93 S.Ct. 1590, 1595, 36 L.Ed.2d 280 (1973); ORS 468.805. The court in *Lansco, Inc. v. Environmental Protection,* 138 N.J.Super. 275, 350 A.2d 520 (1975), *aff'd per curiam* 145 N.J.Super. 433, 368 A.2d 363 (App.Div.1976), interpreting policy provisions identical to those in the St. Paul policy on closely analogous facts, rejected the insurer's arguments that the "sudden and accidental" pollution was not "property damage," and I adopt this rationale as the "reasonable, enlightened view" which the Oregon Supreme Court would adopt, see *Ins. Co. of North America v. Howard, supra,* at 149.

■ St. Paul's next argument is that it should be able to introduce parol evidence tending to prove it did not intend to cover such pollution losses, or that the plaintiff did not intend to secure such coverage from them. I reject this proffer of parol evidence to vary the terms of the insurer's integrated, written contract. Parol evidence is inadmissable to contradict, add to, detract from, or vary a written contract which is clear and explicit and contains no ambiguities. *Oregon-Pacific Forest Prods. v. Welsh Panel Co.,* 248 F.Supp. 903, 908 (D.Or.1965) (Kilkenny, J.); *Barnstaple v. United States National Bank,* 232 Or. 36, 40, 374 P.2d 386, 390 (1962); *Timberline Equip. v. St. Paul,* 281 Or. 639, 643, 576 P.2d 1244 (1978) (Interpretation of an exclusionary clause which is not ambiguous is a matter of law.) This contract is clear and explicit.

The position of St. Paul is that parol evidence should be allowed in to *create* an ambiguity; then parol evidence should be used to *interpret* the contract, given the ambiguity. This is exactly the sort of bootstrapping which the parol evidence rule forbids. *See* ORS 41.740; *Knox v. Hansen,* 242 Or. 114, 120, 408 P.2d 76, 79 (1965): "Since the language is clear we cannot concern ourselves with extrinsic evidence bearing on what the parties understood or in-

tended or with whether the results were equitable."

I hold that, as a matter of law, the St. Paul policy covers the loss.

*Does The WQIS Policy Cover the Loss in Question?*

The Port also had a policy written by WQIS, covering the Port's liability for pollution under the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1251 *et seq.* This policy covers any "discharge" as defined under the FWPCA, and includes both sudden accidental discharges, and more gradual or routine discharges. The St. Paul policy does not cover the latter. 33 U.S.C. § 1321(a)(2). This insurer takes the position that it is not liable on its policy because the dredge OREGON was a "public vessel", *not* "engaged in commerce," which is exempted from FWPCA coverage. *See* 33 U.S.C. § 1321(a).

■ It is true that the FWPCA does not cover "public vessels" *unless* they are "engaged in commerce". The Port admits that the dredge was a "public vessel", but contends that it was "engaged in commerce" in its dredging activities, *cf. Ritch v. Puget Sound Bridge and Dredging,* 156 F.2d 334, 336 (9th Cir. 1946) (Dredging contractors were engaged in commerce for purposes of application of Fair Labor Standards Act). Normally under Oregon law I would interpret the policy so as to provide coverage where any ambiguities exist, but such a principle of construction has been held to be inapposite where coverage depends upon construction of a statute. *Perez v. State Farm,* 289 Or. 295, 299 and n. 2, 613 P.2d 32 (1980). I therefore approach this problem as one of straight statutory construction. *Id.*

■ There are no material issues of fact as to the operation of the dredge or its functions. The OREGON was used to dredge the Columbia and Willamette to specified depths as an aid to navigation. It performed this task under contract to the U.S. Army Corps of Engineers. The sinking of the OREGON occurred as the dredge was being prepared for another dredging

"season". The dredge has performed its duties under contract with the Corps since 1972; prior to that date these functions were performed by private contractors or the Corps' own dredge. During the period 1972–1974, the OREGON was used by the Corps as were other private dredges. After 1974, the OREGON was the only vessel under contract with the Corps for dredging.

There is no case law or relevant legislative history on Congress' intent in exempting public vessels, not "engaged in commerce" from FWPCA. However, it seems probable that Congress intended, by the use of this language to invoke the principle of *United States v. California,* 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936). That case holds that a state or municipality engaging in activity far removed from traditional state functions, which is more commonly performed by the private sector, can be regulated by the Congress under the Commerce Clause. Thus in *United States v. California,* the Supreme Court held that California, by operating a state-owned railroad, was "engaging in interstate commerce" and was subject to federal railroad safety regulation, 297 U.S. 185, 56 S.Ct. 424. This test was subsequently recognized in *National League of Cities v. Usery,* 426 U.S. 833, 852 n. 17, 96 S.Ct. 2465, 2474 n. 17, 49 L.Ed.2d 245 (1976), and is applied to determine whether given governmental operations are "proprietary" or "services . . . which the States have traditionally afforded their citizens." *Id.* at 851, 96 S.Ct. at 2474.

Certain operations of a public body, such as the operation of a coast guard cutter or a fireboat, are exempt from the FWPCA and are not covered by the WQIS policy. However, dredging is not an activity "traditionally afforded" to citizens. Not only was the OREGON in competition with private dredges for Corps work, but the OREGON was paid for its services by the Corps on a cost-recovery basis. Further, Oregon cases hold that such dredging is not a "governmental" function sheltering municipalities from liability by their sovereign immunity, *McKay v. Comm. of Port of Toledo,* 77 Or.

611, 617, 152 P. 250 (1915). This is in accord with the Ninth Circuit's holding in *Ritch v. Puget Sound, supra,* to the effect that contractors engaged in dredging as part of the World War II improvements to Puget Sound navigation were "engaged in commerce." Thus as a matter of statutory construction, and therefore of contract interpretation, I find that the OREGON was covered by the WQIS policy when the loss occurred.

I also reject, as inconsistent with the broad remedial purpose of the FWPCA, the WQIS contention that since the dredge was not actually dredging, but rather being prepared for dredging, at the time of the sinking, it was not "engaged in commerce." *See United States v. Ashland Oil,* 504 F.2d 1317, 1320–1324 (6th Cir. 1974).

*Agency Questions Regarding Cole and James*

■ On the issues of notice of loss and consent to expenditures, the parties present as a question of law the agency status of Cole and James, insurance brokers of the Port. Cole was originally hired by the Port to acquire its insurance; James succeeded to the position. The Port argues that Cole and James were the agents of the insurer, WQIS and that notice to James was notice to WQIS. WQIS contends that James and Cole were only the *Port's* agents for procuring insurance, and that notice of loss to them was ineffective. This is a close question with scant precedent.

The facts which are before me indicate that Cole and James were hired by the Port and are the Port's agents. The Port argues that ORS 744.165 governs. The statute reads as follows:

"Any person who solicits or procures an application for insurance shall in all matters relating to such application for insurance and the policy issued in consequence thereof be regarded as the agent of the insurer issuing the policy and not the agent of the insured. * * * *"

This statute, enacted in 1917, has recently received an expansive interpretation by the Oregon Supreme Court in *Paulson v. Western Life Ins. Co.,* 292 Or. 38, 636 P.2d 935 (1981). There the Oregon Supreme Court held that the statute made an employer who offered a group insurance plan to its employees the agent of the insurer:

In all cases involving the provision now codified as ORS 744.165, the question has been whether the application or the insurance policy can limit the authority of an otherwise officially licensed or designated agent. The cases in this area have supported the conclusion, clearly spelled out in the statute, that neither the policy nor the application can limit the existing agency relationship. Whether this provision can *create* an agency relationship that was not already officially established through the licensing process is a more difficult question. When the predecessor statute to ORS 744.165 was enacted in 1917, little or no group insurance was in effect. The goal the statute aimed to achieve was to bind insurers for the acts of those persons who were involved in the insurance business, including but not limited to licensed agents, as regards the soliciting and procuring of applications for insurance policies. As early as 1889, the Illinois court, in construing a similar statute, stated:

" * * * The manifest intention was, to make such companies responsible for the acts not only of its acknowledged agents, etc., but also of all other persons who in any manner aid in the transaction of their insurance business." *Continental Ins. Co. v. Ruckman,* 127 Ill. 364, 378, 20 N.E. 77, 81 (1889); accord: *Schomer and another v. The Heckla Fire Ins. Co.,* 50 Wis. 575, 583, 7 N.W. 544, 547 (1880).

We believe that ORS 744.165 should be construed consistent with the objective for which it was enacted, and that independently of common law tests of agency it sets the policy of this state toward the position of intermediaries in the sale of insurance. The distribution of insurance coverage to large groups of individuals through an employer or other central entity may not have been known to the legislators who enacted the statute, but that does not make the statute inapplicable.

292 Or. 59–60, 636 P.2d 935 (Emphasis in original).

The issue in this case, then, is whether insurance brokers hired on an annual basis by an insured, as were Cole and James, are agents of the insurer because they are "intermediaries in the sale of insurance," *Paulson, supra,* at 60, 636 P.2d 935.

I hold that they are not. While the agents in question fall within the literal ambit of ORS 744.165, and while that statute can create an agency relationship where none existed before, *Paulson, supra,* at 60, 636 P.2d 935, the agents here served on yearly contracts as the employees of the *insured.* To apply the statute blindly would allow the insured to give notice to the insurer merely by informing its own employees of a loss. These agents would be agents of *both* insurer and insured and the agency relationship would lose whatever meaning it has. This would stretch ORS 744.165 beyond the limited facts of the *Paulson* holding and do violence to the legitimate expectations of an insurer to receive notice of loss. The fundamental fact remains that Cole and James are not "intermediaries" at all, but the contract employees of the insured, and ORS 744.165 does not apply.

*May Attorney's Fees Be Awarded Against the Insurer WQIS?*

 The insurer WQIS, but not St. Paul, argues that the Port cannot receive attorneys' fees if successful, and moves for partial summary judgment on this issue.

Attorneys' fees may be awarded to an insured under 743.114 where the insurer does not settle a claim within six months of proof of loss and the recovery of the insured in an action at law exceeds the insurer's tender. WQIS, however, argues that ORS 743.114 does not apply to a policy of "wet marine" insurance, such as its policy. It is true that ORS 743.003 excludes policies of "wet marine" insurance from the scope of the attorneys' fees provision. The issue on this motion is whether the WQIS policy is "wet marine", such that attorneys' fees are not recoverable, or "general marine," in which case attorneys' fees are recoverable.

"Wet marine" insurance is defined by ORS 731.194, which incorporates by reference the provisions of ORS 731.174(2). If the other provisions of ORS 731.174 apply the WQIS policy is "general marine." Therefore, the issue is whether the WQIS policy is more analogous to the policy types delineated in ORS 731.174(1), or ORS 731.174(2). There is no precedent or legislative history to guide this determination, and none of the provisions of ORS 731.174 are clearly applicable to the WQIS policy. The provision of ORS 731.174 contain considerable overlap in their definitions. It appears to me that the WQIS policy is more nearly analogous to the policy types enumerated in ORS 731.174(1)(b) and ORS 731.174(1)(d) than to the policy types enumerated in ORS 731.174(2) and the WQIS policy is not "wet marine" but "general marine." The attorneys' fee provision of ORS 743.114 applies. I therefore hold that WQIS *may* indeed be liable for attorneys' fees, and I will deny the motion of WQIS for partial summary judgment on this issue.