811 F.2d 1180
 25 ERC 1521, 55 USLW 2417, 17 Envtl.
L. Rep. 20,616
 CONTINENTAL INSURANCE COMPANIES, Appellee,
v.
NORTHEASTERN PHARMACEUTICAL AND CHEMICAL COMPANY, INC.,
Milton Turkel, Edwin B. Michaels and John W. Lee,
Appellees, State of Missouri,
Intervenor-Appellant.
 No. 85-1940.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 15, 1986.
Decided Jan. 22, 1987.
Rehearing En Banc Granted March 30, 1987.*
 
 Shelley A. Woods, Asst. Atty. Gen., Jefferson City, Mo., for State of Missouri.
 Karen Florini, Washington, D.C. for amicus--U.S.
 Gary R. Long, Kansas City, Mo., for Continental Ins. Co.
 Thomas W. Brunner, Washington, D.C., for amicus American Ins. Association.
 William D. Iverson, Washington, D.C., for amicus IBM.
 Jerome T. Wolf, Carl H. Helmstetter, James T. Price, Spencer, Fane, Britt & Browne, Kansas City, Mo., for amicus AT&T Technologies, Inc.
 Before HEANEY and McMILLIAN, Circuit Judges, and MURPHY,* District Judge.
 HEANEY, Circuit Judge.
 
 
 1
 This appeal raises the question of whether hazardous waste cleanup costs under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Secs. 9601-9657 (1982) (CERCLA) are recoverable under a liability policy that covers "property damage" that "occurs" during the life of the policy, where disposal and environmental contamination took place during the policy period but cleanup costs were incurred later. We reverse the district court's order on Count I of Continental's complaint, affirm its dismissal of the State of Missouri's counterclaim, and hold that state and federal governments suffer "property damage" at the time hazardous wastes are improperly "released" into their environment and that cleanup costs are a recoverable measure of damages for this environmental property damage. We also affirm the district court's dismissal without prejudice of Count II of Continental Insurance Company's complaint relating to coverage for private individuals' personal and property damage due to improper hazardous waste disposal.
 
 
 2
 I. FACTS.
 
 
 3
 From 1970 to 1972, the Northeastern Pharmaceutical and Chemical Company (NEPACCO) produced hexachlorophene at a chemical plant in Verona, Missouri. The process produced a variety of wastes, among which was dioxin, a highly toxic chemical. In July, 1971, NEPACCO made arrangements to dispose of at least eighty-five fifty-five-gallon drums of these wastes in a trench on a farm near Verona, Missouri (the "Denny farm" site). When the deteriorated drums were dumped in the trench in July, 1971, a "strong odor" shortly emerged, persisting for several months. United States v. Northeastern Pharm. & Chem. Co., 579 F.Supp. 823, 828-30 (W.D.Mo.1984). Later in 1971 or 1972, NEPACCO hired Independent Petrochemical Corporation (IPC) which, in turn, hired Russell Bliss to dispose of more dioxin-contaminated wastes. In 1971, 1972, and 1973, Bliss allegedly spread thousands of gallons of these wastes on the premises of the Bubbling Springs Stables in Fenton, Missouri, and on the roads of Times Beach, Missouri.[1] Later, in 1974, a Mr. Minker purchased twenty truckloads of contaminated dirt from the Bubbling Springs Ranch and used it as landfill on his property at West Rock Creek Road, Missouri (the "Minker/Stout/Romaine Creek" site).
 
 
 4
 During the two-year period from 1970 to 1972 that NEPACCO was in business, it was insured under a Comprehensive General Liability Policy (CGL),[2] issued by Continental. Three somewhat different policies were in effect from August 5, 1970, to August 5, 1971; August 5, 1971, to August 5, 1972; and August 5, 1972, to November 5, 1972.[3] Each policy requires Continental to:pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of A. bodily injury or B. property damage[4] to which this insurance applies caused by an occurrence,[5] and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage.
 
 
 5
 All three provide that: "[t]his insurance applies only to bodily injury or property damage which occurs during the policy period."
 
 
 6
 In 1980, the EPA investigated the Denny farm site and found that the NEPACCO wastes in the trench and underlying soil contained "alarming[ly] high concentrations of dioxin." Id. at 831. It cleaned up the site, and then sought to recover its costs through a lawsuit against NEPACCO and others. United States v. Northeastern Pharm. & Chem. Co., 579 F.Supp. 823 (the "EPA " suit). The district court found NEPACCO and the other defendants jointly and severally liable under CERCLA for the cost of the cleanup.[6] A separate appeal in that action is now pending before another panel of this Court.
 
 
 7
 On March 7, 1983, a number of former residents of Times Beach and Imperial, Missouri, filed an action against NEPACCO and others which seeks recovery for personal injuries and property damage allegedly caused by the dumping of NEPACCO's wastes at the Minker/Stout/Romaine Creek site and on the streets of Times Beach. Capstick v. Independent Petrochemical Corp., No. 832-0453 (Cir.Ct., City of St. Louis, Mo. filed Mar. 7, 1983) (the "Capstick " suit).
 
 
 8
 To protect against potential liability arising out of its status as insurance carrier for NEPACCO during the time NEPACCO's hazardous wastes were improperly disposed of, Continental filed this action against NEPACCO and its former officers and directors. Count I seeks a declaration that Continental is under no duty to defend or indemnify NEPACCO for liability arising out of the EPA[7] suit. Count II seeks the same declaration with respect to the Capstick suit. On November 14, 1984, Continental moved for summary judgment. NEPACCO and the other defendants failed to enter an appearance or file an answer.[8]
 
 
 9
 The State of Missouri was then granted leave to intervene to protect its interests arising out of claims that it had made against NEPACCO and the other defendants in a third hazardous-waste lawsuit filed in the United States District Court for the Eastern District of Missouri. Missouri v. Independent Petrochemical Corp., No. 83-3670 (E.D.Mo. filed Nov. 23, 1983) (the "IPC " suit). The complaint in IPC alleges that NEPACCO, its officers, and others are liable under CERCLA for costs incurred by the state in excavating and removing dioxin-contaminated soil from the Minker/Stout/Romaine Creek site. The state filed an answer to Continental's complaint and a counterclaim alleging that Continental is obligated to indemnify the state for the amount of any judgment imposed on NEPACCO in the underlying IPC lawsuit.
 
 
 10
 On June 25, 1985, the district court granted summary judgment to Continental on Count I of its complaint (no insurance coverage for the EPA claims), and against the state on its counterclaim (no coverage for the IPC claims). The court reasoned that the cleanup costs sought by the United States and the state in the EPA and IPC suits are not "property damage" as that term is defined in the CGL policies and that "no * * * damages were incurred by the government entities during the policies' effective dates" because the policies were only in effect from 1970 to 1972, and the cleanup costs were incurred later. The court also granted Continental's motion to dismiss without prejudice Count II of its complaint (the Capstick claims), stating that "more specific findings of bodily injury and property damage" were needed first. The State of Missouri appeals.[9]
 
 
 11
 II. DISCUSSION.
 
 
 12
 A. EPA and IPC Claims.
 
 
 13
 The first issue is whether the district court erred in holding that cleanup costs under CERCLA are not "property damage" as defined in the CGL policies.[10] Although the district court cited no case and gave no explanation for its holding, Continental and amicus AIA advance two arguments in support.
 
 
 14
 Continental argues that only the actual owners of the land on which hazardous wastes are improperly disposed of sustain "property damage," and that any injury suffered by governmental entities from the improper disposal is merely an economic injury.[11] We disagree.
 
 
 15
 The Supreme Court of the United States has held that state and federal governments suffer injury to their "quasi-sovereign" interests when pollutants are released into the soil, water, and air within their jurisdiction. See Georgia v. Tennessee Copper Co., 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed.2d 1038, 1044 (1907) (state); cf. Illinois v. City of Milwaukee, 406 U.S. 91, 101-07, 92 S.Ct. 1385, 1391-94, 31 L.Ed.2d 712, 722-26 (1972) (federal). The question here is whether this injury to governmental "quasi-sovereign" interests constitutes "property damage" within the meaning of an insurance policy. Although the Supreme Court has not squarely confronted the issue, two thoughts expressed in cases decided by the Court lead us to reject Continental's argument. First, it has implied that an injury to a government's quasi-sovereign interest in natural resources is a form of property damage. Second, it has held that the government has power, in its quasi-sovereign capacity, to seek redress for the environmental property damage suffered by the actual owners of the land affected by pollution.
 
 
 16
 In Georgia v. Tennessee Copper Co., 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038, for example, the State of Georgia brought suit against certain Tennessee copper companies to enjoin the discharge of noxious gases over its territory. In holding that it had jurisdiction and that Georgia was entitled to an injunction, the Court stated:
 
 
 17
 The state owns very little of the territory alleged to be affected, and the damage to it capable of estimate in money, possibly, at least, is small. This is a suit by a state for an injury to it in its capacity of quasi-sovereign. In that capacity the state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air. It might have to pay individuals before it could utter that word, but with it remains the final power. The alleged damage to the state as a private owner is merely a make-weight, and we may lay on one side the dispute as to whether the destruction of forests has led to the gullying of its roads.
 
 
 18
 206 U.S. at 237, 27 S.Ct. at 619, 51 L.Ed. at 1044.
 
 
 19
 The Court's discussion of a governmental interest in "title" to all the soil, water, and air within its jurisdiction suggests that the government has a property interest in natural resources. A similar implication arises from Missouri v. Illinois, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901), where the Court held that Missouri was permitted to sue as parens patriae to enjoin the discharge of sewage from Chicago, Illinois, into the Illinois and Mississippi rivers: "impairment of the health and prosperity of the towns and cities of the state situated on the Mississippi river * * * would injuriously affect the entire state." 180 U.S. at 241, 21 S.Ct. at 344, 45 L.Ed. at 512. The Court suggested that although a dispute between states over interstate waters may not involve "direct property rights" of a state, the injury to the state's "quasi-sovereign" rights is akin to an injury to state property rights.[12] Id. Furthermore, the Court stressed that in environmental damage suits, a state has the power to seek redress in court for the property damage caused to the general public. Id.; see also Maryland v. Louisiana, 451 U.S. 725, 766, 101 S.Ct. 2114, 2139, 68 L.Ed.2d 576, 608 (1981) (Rehnquist, J., dissenting on other grounds) (pointing out that when a state sues to advance its quasi-sovereign interests, it is not suing simply to protect the economic interests of its citizens). Similarly, in Toomer v. Witsell, 334 U.S. 385, 408, 68 S.Ct. 1156, 1168, 92 L.Ed. 1460 (1948), Mr. Justice Frankfurter, joined by Mr. Justice Jackson, concurring, stated:
 
 
 20
 A state may care for its own in utilizing the bounties of nature within her borders because it has technical ownership of such bounties or, when ownership is in no one, because the state may for the common good exercise all the authority that technical ownership ordinarily confers.
 
 
 21
 This conclusion is supported by statements in a wide array of cases and statutes that state and federal governments have property interests in wildlife,[13] inter- and intra-state waters,[14] and natural resources in general.[15] Moreover, state and federal governments have "direct property interests" in public land holdings which may be damaged by environmental contamination.
 
 
 22
 In light of these extensive statements of governmental property interests in environmental resources, it does not seem unreasonable to assume that an insurance company, providing liability coverage for a chemical producer, would contemplate environmental damage as a form of covered "property damage for which governments may seek recovery." See Lansco, Inc. v. Department of Envtl. Protection, 138 N.J.Super. 275, 350 A.2d 520, 524-25 (1975), aff'd, 145 N.J.Super. 433, 368 A.2d 363 (1976), cert. denied, 73 N.J. 57, 372 A.2d 322 (1977). The policies' definition of "property damage" as damage to "tangible property" or "physical injury" seems to contemplate damage to tangible property such as land, trees, air, and water. Supportive of this is the inclusion in the latter two of the three policies at issue of clauses generally excluding environmental damage from coverage for property damage. See Port of Portland v. Water Quality Ins. Syndicate, 549 F.Supp. 233, 235 (D.Ore.1982) (The pollution exclusion clause "itself states that 'property damage' may result from the discharge of pollutants.").
 
 
 23
 Finally, all of the cases which have squarely considered Continental's argument have rejected it.[16] In Mraz v. American Universal Ins. Co., 616 F.Supp. 1173 (D.Md.1985), for example, the court rejected as "untenable" the insuror's claim that state and federal governments do not sustain "property damage" for insurance policy purposes when hazardous wastes are improperly disposed of and ultimately cleaned up by the government. A similar conclusion was reached in Lansco, 350 A.2d at 524-25, and Kutsher's Country Club Corp. v. Lincoln Ins. Co., 119 Misc.2d 889, 465 N.Y.S.2d 136, 139 (N.Y.Sup.Ct.1983).[17]
 
 
 24
 In sum, we agree with the position taken in Mraz, Lansco, and Kutsher's that the improper release of toxic wastes may cause "property damage" not only to the actual owner of the land, water, or air, but also to state and federal governments because of their "interest independent of and behind the titles of its citizens in all the earth and air within [their] domain." Tennessee Copper Co., 206 U.S. at 237, 27 S.Ct. at 619, 51 L.Ed.2d at 1044.
 
 
 25
 Amicus AIA assumes, at least for purposes of argument, that environmental contamination may cause "property damage" for which state and federal governments may seek relief. However, it argues that while the governments might be able to recover for the diminution in value of environmental resources, cleanup costs themselves are not recoverable. It bases this argument on the language of section 107 of CERCLA which provides:
 
 
 26
 (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or site selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for--
 
 
 27
 (A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;
 
 
 28
 (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and
 
 
 29
 (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.
 
 
 30
 42 U.S.C. Sec. 9607(a)(4).
 
 
 31
 A close reading of this section fails to support AIA's argument that only an action under the last subsection, section 9607(a)(4)(C), is an action for "property damage."[18] It seems clear to us that, although subsection (C) directly provides for recovery for damage to natural resources, subsections (A) and (B) are also measures of the damages which governmental entities may recoup for hazardous waste damage to natural resources. This conclusion is supported by all of the on-point cases cited by the parties or revealed by our independent research.[19] See, e.g., Askew v. American Waterways Operators, 411 U.S. 325, 331, 93 S.Ct. 1590, 1595, 36 L.Ed.2d 280, 286 (1973) (In discussing the Water Quality Improvement Act of 1970, 84 Stat. 91, 33 U.S.C. Secs. 1161 et seq. (1972), and a similar Florida Act, the Court stated, "While the Federal Act determines damages measured by the cost to the United States for cleaning up oil spills, the damages specified in the Florida Act relate in part to the cost to the State of Florida in cleaning up the spillage."); Riehl v. Travelers Ins. Co., 22 Env't Rep.Cas. (BNA) 1544, 1546 (W.D.Pa. Aug. 7, 1984), rev'd on other grounds, 772 F.2d 19 (3d Cir.1985) (Measure of damages to ground water and streams caused by seepage of wastes from insured's landfill "is not precisely calculable but includes abatement costs relative to preventing further pollution."); Port of Portland, 549 F.Supp. at 235 (Cost of cleaning up oil spill is recoverable "property damage" under CGL policy.); Chem. Application Co. v. Home Indem. Co., 425 F.Supp. 777, 778 (D.Mass.1977) (Cleanup and removal expenses incurred by insured measure the "damages" for which indemnification is available.); Waste Management of Carolinas, Inc. v. Peerless Ins. Co., 72 N.C.App. 80, 323 S.E.2d 726, 735 (N.C.App.1984), rev'd on other grounds, 315 N.C. 688, 340 S.E.2d 374 (1986) (Cleanup costs are "essentially compensatory damages for injury to common property," the ground water of the State of North Carolina.); Kutsher's Country Club Corp., 465 N.Y.S.2d at 139 ("The cost of cleanup * * * is clearly reflective of the state's power to establish damages with respect to legislation designed to preserve the sovereign state's interest in the preservation of natural resources."); Lansco, Inc. v. Department of Envtl. Protection, 350 A.2d at 525 (Measure of damages for pollution discharge in river is "the cost of eliminating the harmful substance from the waters of the state.").[20] But cf. Atlantic City Mun. Util. Auth., No. A-1320-94TF (N.J.Super.Ct.App.Div.1985); Linda Walls, No. 2-83-418 (E.D.Tenn. Oct. 11, 1983).
 
 
 32
 Finally, the language of the CGL policies at issue supports the view that cleanup costs are a measure of recoverable damages for injury to environmental resources. The language of the policies specifically require Continental to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages * * * because of property damage." This language suggests that once there is property damage--here, environmental contamination--then the damages that flow from that property damage--here, cleanup costs--are recoverable.[21]
 
 
 33
 In sum, the cases, the CGL policy language, the common meaning of "property damage," and section 107 of CERCLA all support the governments' argument that cleanup costs under CERCLA are compensatory damages for "property damage" within the meaning of the CGL policies. Accordingly, we adopt this view.
 
 
 34
 The remaining issue is whether the district court erred in holding that the governments did not suffer an "occurrence" of property damage during the policy period because, although the improper waste disposal occurred during the policy period, the cleanup costs were not incurred until long after the policies expired.[22] We hold that it did and adopt the majority view that environmental damage occurs at the moment that hazardous wastes are improperly released[23] into the environment and that a liability policy in effect at the time this damage is caused provides coverage for the subsequently incurred costs of cleaning up the wastes.[24] In Mraz, 616 F.Supp. at 1179, for example, the court rejected the same argument made by the insurer here and held that further fact findings were called for on an allegation that "environmental damage began to take place immediately in 1969 upon dumping at the Leslie site creating the potential for liability within the scope of the 1969 policy." A similar conclusion has been reached in numerous other cases. See, e.g. Payne, 625 F.Supp. at 1103 (Implicitly finding that improper disposal of hazardous wastes during policy period is an "occurrence" of "property damage" at the time of release into the environment.); Mercury Refining Co. v. Hartford Fire Ins. Co., No. 84-CU-495, (N.D.N.Y. July 19, 1985) (same); Riehl, 22 Envtl.Rep.Cas. (BNA) at 1546, rev'd and remanded on other grounds for further findings, 772 F.2d 19 (3d Cir.1985) (same); Buckeye Union Ins. Co., 477 N.E.2d at 1233 (Insurer during the time period when hazardous wastes were "released" into surrounding soil and groundwater has duty to defend CERCLA cleanup suit under CGL policy.); CPS Chem. Co., 489 A.2d at 1269 ("Time of discovery of the accident does not determine when [damage] took place. The complaint alleges damages commencing with the date of dumpings.").[25]
 
 
 35
 Quite similar to this line of decisions are cases involving insurance coverage for "progressive diseases" where exposure to a harmful substance occurred during the policy period but the disease or illness developed later after the policy expired. The majority of federal cases on this issue have found coverage by adopting the "exposure,"[26] or the "continuous exposure,"[27] theory of when injury occurs. These decisions rest on the view that exposure to the dangerous substance at issue during the policy period caused immediate, albeit undetectable, physical harm which ultimately led to disease or physical impairment after the expiration of the policy period. For example, in Forty-Eight Insulations, 633 F.2d at 1223, the Court, in finding coverage for a progressive disease which manifested itself after the policy period, stated, "We see nothing in the policy which requires that the underlying cause of action accrue within the policy period. There exists a clear distinction between when bodily injury occurs and when the bodily injury that has occurred becomes compensable." Accord Porter v. American Optical Corp., 641 F.2d 1128, 1145 (5th Cir.), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 878 (1981).
 
 
 36
 These cases are distinguishable from cases where a negligent act was committed during the policy period but an accident or injury did not occur until after the policy expired.[28] For example, if one negligently fails to shovel snow off his sidewalk during the policy period, there is no compensable accident until and if someone slips and injures himself during the policy period. This distinction was discussed in Mueller Fuel Oil Co. v. Insurance Co. of North America, 95 N.J.Super. 564, 232 A.2d 168, 175 (N.J.Super.Ct.App.Div.1967), a case involving insurance coverage for a claim of malicious prosecution, where the court wrote:
 
 
 37
 The tort of negligence is not committed unless and until some damage is done. Therefore, the important time factor in determining insurance coverage where the basis of the claim is negligence, is the time when the damage has been suffered. In a claim based on malicious prosecution the damage begins to flow from the very commencement of the tortious conduct--the making of the criminal complaint. The wrong and damage are practically contemporaneous * * *.
 
 
 38
 It seems to us that in the case of improper hazardous waste disposal, the wrong and the resulting damage may also be practically contemporaneous.
 
 
 39
 The decision in Kissel v. Aetna Cas. & Sur. Co., 380 S.W.2d 497 (Mo.Ct.App.1964), is particularly relevant on the crucial question of how the Missouri courts would likely rule on the question of when property damage occurs for purposes of insurance coverage. In Kissel, a building contractor hired to build a school employed a subcontractor to dig the foundation and to do landscaping work. During the excavation work in 1952, a series of pressure cracks developed in the ground around the school. The cracks were filled in with dirt and the school construction and landscaping were completed in 1953. The contractor carried a comprehensive general liability policy which covered property damage done by itself and its subcontractors in the course of their construction work. The CGL policy expired in late 1952. In 1957, the cracks reappeared and spread to several pieces of property adjoining the school. Five owners of these pieces of property brought suit, and the construction company instituted suit seeking a declaration that the CGL policy in effect in 1952 covered the damage which occurred in 1957. The insurance carrier argued "that the accident in question occurred in 1957, and not during the policy period, which was November 1951 to November 1952. Under those circumstances, * * * it cannot be held responsible for the damages shown in evidence." 380 S.W.2d at 507. The court rejected this contention, noting that there was not merely an act of negligent excavation during the policy period, but that this negligence also caused immediate property damage during the policy period which, by 1957, after the policy period, spread to adjoining property. "We agree * * * that the accident mentioned in the policy may be a process and the evidence in the instant case is sufficient to show that the process started during the term of the policy and progressed until the filing of the lawsuits. We rule this point against defendant." Id. at 509. We find that the Kissel case clearly indicates that Missouri would follow the majority view of the courts which have ruled that "property damage," within the meaning of a CGL policy, generally occurs at the time hazardous wastes are improperly disposed of and that the insurer at that time may be held liable for cleanup costs incurred after the policy expired.
 
 
 40
 Applying these principles, it is clear that the "property damage" proved in the EPA case, 579 F.Supp. at 830, first occurred in July, 1971, during the period of time when the first insurance policy issued by Continental to NEPACCO was in effect. EPA, 579 F.Supp. at 830 (noting that NEPACCO's agents dumped leaking, deteriorated barrels into the trench at the Denny Farm site and that, upon dumping of the wastes, a "strong odor emitted" and "continued for several months, maybe years.").[29] Under Kissel, it is also clear that Continental may additionally be liable for the continuing spread of the "property damage" at and around the Denny farm site, which first began in July, 1971. Kissel, 380 S.W.2d at 509. Accordingly, we reverse the district court's order with respect to Count I of Continental's complaint and remand for resolution of the remaining issues[30] which must be resolved before it can be determined whether Continental must indemnify NEPACCO for the damages awarded in the EPA suit.
 
 
 41
 It also follows, however, from our holding on the question of the time of the relevant "property damage" "occurrence," that Continental is not liable to defend or indemnify NEPACCO for liability arising from the IPC suit. The complaint in IPC alleges that in 1971 or 1972, Russell Bliss, pursuant to an agreement with IPC and NEPACCO, transported dioxin-contaminated waste oil from the NEPACCO plant in Verona, Missouri, and spread the contaminated oil on the premises of the Bubbling Springs Stable in Fenton, Missouri. This would be the relevant time of the "property damage" "occurrence" for purposes of cleaning up the Bubbling Springs Stable. However, the IPC complaint does not seek to recover costs for cleaning up the Bubbling Springs Ranch, nor does it seek recovery for the diminution in the value of resources at or around the Bubbling Springs Ranch and its watershed. Instead, the state seeks to recover the costs of cleaning up the Minker/Stout/Romaine Creek site which was contaminated when twenty loads of contaminated fill dirt from the Bubbling Springs Ranch were deposited there in 1974, after the CGL policies had expired. Because the damage at the Minker/Stout/Romaine Creek site first occurred after the last CGL policy's effective date, we find that it would be beyond the reach of the reasoning in Kissel to hold Continental liable for this damage which began after the policy lapsed. Accordingly, we affirm the district court's finding on the state's counterclaim that Continental has no duty to defend or indemnify NEPACCO for potential liability in the pending IPC suit.
 
 
 42
 B. Capstick Claims.
 
 
 43
 The State of Missouri contends that the district court erred in dismissing, without prejudice, Count II of Continental's complaint which seeks a declaration of no duty to defend or indemnify NEPACCO in the Capstick lawsuit. The Capstick suit differs in several respects from the EPA and IPC suits. The latter involve governmental cleanup cost recoveries under CERCLA; the former involves claims by private individuals for personal and property damage arising out of improper disposal of NEPACCO's hazardous wastes. We agree with the trial court that resolution of the insurance coverage issues in Capstick requires additional fact finding and analysis, see Independent Petrochemical Corp. v. Aetna Cas. and Sur. Co., Civ. No. 83-3347, (D.D.C., filed Feb. 4, 1986), which may be pursued most effectively in a different proceeding. Accordingly, the district court's decision granting Continental's motion to voluntarily dismiss Count II without prejudice is affirmed.
 
 
 44
 McMILLIAN, Circuit Judge, concurring in part and dissenting in part.
 
 
 45
 For the reasons discussed below, I would affirm the order of the district court, although for reasons different than those set forth in its memorandum order. This appeal presents difficult issues the resolution of which will have a substantial effect upon liability insurance cases involving hazardous waste disposal.
 
 
 46
 I agree with much of the analysis set forth in the majority opinion. Specifically, I agree that Missouri law applies to these insurance policies. Missouri is the state that has the most significant relationship with the comprehensive general liability (CGL) insurance policies at issue. Maj. op. at 1184, note 10. I also agree with the majority that environmental damage is "damage to property" and that the release into the environment of hazardous wastes may cause property damage not only to the actual owners of land, water and air, but also to the quasi-sovereign interests of governmental entities. Maj. op. at 1184-87.
 
 
 47
 I also agree with the majority, op. at 1184-93, that under Missouri law "the issue of liability under a policy insuring against 'loss' or 'damage' occurring during the policy period is determined by the time when the loss or damage occurs and not by the time of the negligent [or wrongful] act." Hawkeye-Security Insurance Co. v. Iowa National Mutual Insurance Co., 567 S.W.2d 719, 720 (Mo.Ct.App.1978), citing Kirchner v. Hartford Accident & Indemnity Co., 440 S.W.2d 751 (Mo.Ct.App.1969).
 
 
 48
 Given the specific facts in the present case, I further agree that property damage "occurred" in mid-July 1971, at a time within the policy period of the first CGL policy. Maj. op. at 1191. Here, the crucial events--the wrongful act, the release of hazardous wastes into the environment ("property damage") and the "occurrence"--all happened virtually simultaneously. In some hazardous waste disposal cases, the act of disposal may cause the release of hazardous wastes into the environment at some point in the future. For example, the initial disposal may not result in a release of hazardous wastes within the policy period but much later after the policy has lapsed. In the present case, however, the disposal of the hazardous wastes immediately resulted in their release into the environment and, because by definition hazardous wastes are extremely harmful, there was clearly an "occurrence" of "property damage" within the policy period. Here, the geological and hydrological characteristics of the site made it unsuitable for the disposal of hazardous wastes; the hazardous wastes had been stored in drums that at the time of disposal were in a deteriorated condition; the drums were simply buried in an excavated trench; a strong odor emerged shortly thereafter and persisted for several months. Thus, the "occurrence" issue is something of a false issue on these facts.
 
 
 49
 I do not agree, however, with the majority that "cleanup costs under CERCLA are compensatory damages for 'property damage' within the meaning of the CGL policies." Maj. op. at 1189 (emphasis added). I would hold that under these CGL policies the insurer has no obligation to pay cleanup costs because cleanup costs constitute equitable monetary relief but not legal damages.
 
 
 50
 "An insuring obligation is a contract, and coverage exists only if assumed by the terms of the policy." Aetna Casualty & Surety Co. v. Hanna, 224 F.2d 499, 503 (5th Cir.1955). Here, under the terms of the CGL policies, the insurer is required to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... B. property damage to which this insurance applies caused by an occurrence...." "The obligation of the insurer to pay is limited to 'damages,' a word which has an accepted technical meaning in law." Aetna Casualty & Surety Co. v. Hanna, 224 F.2d at 503. "The word 'damages' is not ambiguous in the insurance context. Black letter insurance law holds that claims for equitable relief are not claims for 'damages' under liability insurance contracts." Maryland Casualty Co. v. Armco, Inc., 643 F.Supp. 430, 432 (D.Md.1986), citing Haines v. St. Paul Fire & Marine Insurance Co., 428 F.Supp. 435, 439-41 (D.Md.1977), Aetna Casualty & Surety Co. v. Hanna, 224 F.2d at 503-04, and Desrochers v. New York Casualty Co., 99 N.H. 129, 106 A.2d 196, 198-99 (1954). See also Garden Sanctuary, Inc. v. Insurance Co. of North America, 292 So.2d 75, 77-78 (Fla.Ct.App.1974); Ladd Construction Co. v. Insurance Co. of North America, 73 Ill.App.3d 43, 29 Ill.Dec. 305, 307-08, 391 N.E.2d 568, 570-73 (1979). But see United States Aviex Co. v. Travelers Insurance Co., 125 Mich.App. 579, 336 N.W.2d 838, 843 (1983) (rejecting analysis in Aetna Casualty & Surety Co. v. Hanna as interpreting "damages" too narrowly).
 
 
 51
 "Traditionally, courts have found no insurance coverage for the costs of complying with an injunction even in cases where the suits could have been brought for damages." Maryland Casualty Co. v. Armco, Inc., 643 F.Supp. at 434. Here, the federal government in the EPA lawsuit and the state of Missouri in the IPC lawsuit seek recovery of cleanup or response costs pursuant to CERCLA Sec. 107(a)(4)(A), 42 U.S.C. Sec. 9607(a)(4)(A). These actions are essentially equitable actions for monetary relief in the form of restitution or reimbursement of costs. See United States v. Northeastern Pharmaceutical & Chemical Co., 810 F.2d 726, at (8th Cir.1986). The federal and state governments do not seek recovery of "damages for injury to, destruction of, or loss of natural resources," pursuant to CERCLA Sec. 107(a)(4)(C) (emphasis added), 42 U.S.C. Sec. 9607(a)(4)(C) (emphasis added).
 
 
 52
 In short, I cannot agree that cleanup costs are the equivalent of "damages," Maryland Casualty Co. v. Armco, Inc., 643 F.Supp. at 435. CERCLA defendants are liable for both cleanup costs under CERCLA Sec. 107(a)(4)(A), 42 U.S.C. Sec. 9607(a)(4)(A), and for damages to natural resources under CERCLA Sec. 107(a)(4)(C), 42 U.S.C. Sec. 9607(a)(4)(C); in a particular case, the measure of liability for cleanup costs and for damages to natural resources may be the same. Maj. op. at 1187-1190 & note 20, citing Jack L. Baker Cos. v. Pasley Manufacturing & Distributing Co., 413 S.W.2d 268, 273-74 (Mo.1967). Merely because "no practical difference exists between the sums which the insured [, that is, the CERCLA defendant,] must pay the court under some equitable remedy as opposed to sums payable for damages," Maryland Casualty Co. v. Armco, Inc., 643 F.Supp. at 435 (emphasis added), does not mean that the sums constitute equivalent obligations to pay on the part of the insurer.
 
 
 53
 In United States Aviex Co. v. Travelers Insurance Co., 336 N.W.2d at 843, the court described as "merely fortuitous" from the standpoint of either plaintiff [insured] or defendant [insurer] whether the state chooses to pursue an equitable remedy rather than to sue to recover damages, because "the damage to the natural resources is simply measured in the cost to restore the [environment] to its original state." In my view, that analysis must be limited to the liability of the insured and the measurement of that liability under environmental laws like CERCLA. The liability of the insurer is a distinct issue, and I would argue that, at least with respect to the liability of the insurer under the CGL policies, whether the federal and state governments choose to pursue equitable remedies or to recover damages is not "merely fortuitous."
 
 
 54
 I also agree that the insurer has no duty to defend the IPC lawsuit because the property damage occurred in 1974 after the policies lapsed, maj. op. at 1192-1193 and because, as discussed above, cleanup costs are not "damages."
 
 
 55
 I also agree that the issues in the Capstick lawsuit require additional factfinding and analysis and are therefore unsuitable for summary disposition. Maj. op. at 1193. Because the private individuals in Capstick are seeking damages for personal injury and property damage due to the improper disposal of hazardous wastes and not cleanup costs consistent with the national contingency plan pursuant to CERCLA Sec. 107(a)(4)(B), 42 U.S.C. Sec. 9607(a)(4)(B), I would hold the insurer cannot refuse to defend the Capstick lawsuit for that reason.
 
 
 56
 Accordingly, I would affirm the order of the district court.
 
 
 
 *
 Order published at 815 F.2d 51
 
 
 *
 The Honorable DIANA E. MURPHY, United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 Times Beach was a town of approximately 2,200 people located twenty-five miles southwest of St. Louis. Soil samples taken there by the EPA in the early 1980's revealed soil dioxin levels in excess of one hundred times the Center for Disease Control's recommended maximum soil dioxin level for residential areas. In February, 1983, the EPA announced that the government would purchase the entire town of Times Beach using $33.7 million from the federal Superfund. The State of Missouri contributed an additional $3.3 million to the buy-out
 
 
 [2]
 The drafting history and background of the standard-form CGL policy is discussed in American Home Prods. Corp. v. Liberty Mut. Ins. Co., 565 F.Supp. 1485, 1500-03 (S.D.N.Y.1983), aff'd as modified, 748 F.2d 760 (2d Cir.1984)
 
 
 [3]
 The latter two policies, covering the period August 5, 1971, to November 17, 1972, contain the following "pollution and contamination" exclusion clause:
 It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental.
 The United States Court of Appeals for the First Circuit has held that coverage for damages caused by hazardous wastes improperly disposed of by the plaintiff in the regular course of its business is excluded by the same "pollution exclusion" clause. Great Lakes Container Corp. v. National Union Fire Ins. Co., 727 F.2d 30 (1st Cir.1984); see also Travelers Indemn. Co. v. Dingwell, 414 A.2d 220 (Me.1980). Other courts have reached the opposite conclusion where the hazardous waste discharge was sudden or accidental or the wastes were negligently disposed of by a third-party contractor or were disposed of in full compliance with all applicable rules and regulations, or the wastes were generated other than in the regular course of the insured's business. See, e.g., Payne v. United States Fid. and Guar. Co., 625 F.Supp. 1189 (S.D.Fla.1985); Technicon Electronics Corp. v. American Home Assurance Co., No. 08811/85 (N.Y.Sup.Ct. Feb. 13, 1986); Buckeye Union Ins. Co. v. Liberty Solvents & Chemicals Co., 17 Ohio App.3d 127, 477 N.E.2d 1227 (Ohio Ct.App.1984); Niagara County v. Utica Mutual Ins. Co., 80 A.D.2d 415, 439 N.Y.S.2d 538 (N.Y.App.Div.), mot. for lv. to app. dism., 54 N.Y.2d 608, 427 N.E.2d 1191, 443 N.Y.S.2d 1030 (1981); Lansco, Inc. v. Department of Envtl. Protection, 138 N.J.Super. 275, 350 A.2d 520 (N.J.Super.Ct.Ch.Div.1975), aff'd, 145 N.J.Super. 433, 368 A.2d 363 (N.J.Super.Ct.App.Div.1976), cert. denied, 73 N.J. 57, 372 A.2d 322 (1977). Whether the "pollution exclusion" clause excludes coverage in this case is not at issue on appeal because the district court found a lack of coverage on other grounds.
 
 
 [4]
 All three policies define "property damage" as follows:
 (1) Physical injury or destruction of tangible property which occurs during the policy period, including the loss of use thereof at anytime resulting therefrom,
 (2) Loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period * * *.
 
 
 [5]
 All three policies define "occurrence" as "an accident, including continuous or repeated exposure to conditions, injury or property damage neither expected nor intended from the standpoint of the insured." Several courts have held that the discharge of hazardous wastes is an "occurrence" within this type of provision where the discharge or the extent of the damage was not expected or intended. See, e.g., Mraz v. American Universal Ins. Co., 616 F.Supp. 1173, 1177-78 (D.Md.1985), appeal docketed, No. 85-2399 (4th Cir., Dec. 27, 1985) Steyer v. Westvaco Corp., 450 F.Supp. 384, 388 (D.Md.1978); Waste Management of Carolinas, Inc. v. Peerless Ins. Co., 315 N.C. 688, 340 S.E.2d 374, 380 (1986); CPS Chem. Co. v. Continental Ins. Co., 199 N.J.Super. 558, 489 A.2d 1265, 1269 (N.J.Super.Ct. Law Div.1984), rev'd and remanded on other grounds, 203 N.J.Super. 15, 495 A.2d 886 (N.J.Super.Ct.App.Div.1985); Buckeye Union Ins. Co., 477 N.E.2d at 1233. But see American States Ins. Co. v. Maryland Cas. Co., 587 F.Supp. 1549 (E.D.Mich.1984). This is not an issue on this appeal because the district court found a lack of coverage on other grounds
 
 
 [6]
 The district court entered judgment in favor of the EPA for $155,171.93. Although the court noted that the stored wastes at the Denny farm site no longer present an imminent and substantial danger to health and environment, 579 F.Supp. at 832, the waste necessitates future monitoring and further response costs for which NEPACCO and the other defendants remain liable. Id. at 852-53
 
 
 [7]
 On February 25, 1985, the United States filed a garnishment action seeking to collect from Continental, as NEPACCO's liability insurer, the sums awarded in the underlying EPA suit. United States v. Continental Ins. Co., No. 85-3069-CV-S-4 (W.D.Mo. filed Feb. 25, 1985). The district court initially entered judgment in favor of Continental based on its judgment in the present action, Continental v. NEPACCO, No. 84-5034-CV-S-4 (W.D.Mo. filed June 25, 1985), then granted the United States's motion for reconsideration. Continental then moved for summary judgment, and resolution of this motion has been held in abeyance until the appeal in the EPA suit, 579 F.Supp. 823, is resolved
 
 
 [8]
 NEPACCO's corporate charter was forfeited by the Delaware Secretary of State in August, 1976. NEPACCO never filed a formal certificate of dissolution, but in 1974, its assets were liquidated and the proceeds distributed to shareholders after payment of outstanding debts. See United States v. Northeastern Pharm. & Chem. Co., 579 F.Supp. 823, 827 (W.D.Mo.1984). Thus, at the time Continental filed its complaint, NEPACCO had been a defunct or "shell" corporation for some ten years
 
 
 [9]
 The United States and Armco, Inc., AT & T Technologies, Inc., FMC Corporation, and International Business Machines Corporation appear as amicus curiae in support of the state. The American Insurance Association (AIA) appears as amicus curiae in favor of Continental
 
 
 [10]
 We agree with the district court that Missouri law governs the interpretation of the insurance policies at issue because that state has the most significant relation with the negotiation and terms of the insurance contract. Havenfield Corp. v. H.R. Block, Inc., 509 F.2d 1263 (8th Cir.), cert. denied, 421 U.S. 999, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975); Ryder Truck Rental, Inc. v. U.S. Fid. and Guar. Co., 527 F.Supp. 666 (E.D.Mo.1981); National Starch & Chem. Corp. v. Newman, 577 S.W.2d 99 (Mo.Ct.App.1978)
 
 
 [11]
 Continental cites to Giddings v. Industrial Indemn. Co., 112 Cal.App.3d 213, 219, 169 Cal.Rptr. 278, 281 (Cal.Ct.App.1981), where the court stated that "strictly economic losses like lost profits, loss of goodwill, loss of anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to tangible property covered by a comprehensive general liability policy." See also CMO Graphics, Inc. v. CNA Ins., 115 Ill.App.3d 491, 71 Ill.Dec. 172, 175-76, 450 N.E.2d 860, 863-64 (1983)
 
 
 [12]
 See also, e.g., State v. Leavitt, 105 Me. 76, 79, 72 A. 875, 877, 72 A. 875 (1909) (Each state's interest in the natural resources within its borders "is in fact a property right.")
 
 
 [13]
 See, e.g., Geer v. Connecticut, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896) (State has property interest in and police power over wild game within its jurisdiction because of its sovereign capacity as representative of the people in their common ownership of wild game.); State v. Taylor, 358 Mo. 279, 214 S.W.2d 34, 36 (1948) (State has "property right" in wildlife of state.); Mo.Ann.Stat. Sec. 252.030 (Vernon 1963) ("The ownership of and title to all wildlife of and within the state * * * are hereby declared to be in the State of Missouri."). The federal government would also seem to have a protectable interest in wildlife, and interest which might be characterized as a form of property right. Cf. Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920)
 
 
 [14]
 It has been generally stated that interstate navigable waters and their watersheds are "public property of the nation," United States v. Chicago, M., St. P. & P.R. Co., 312 U.S. 592, 596, 61 S.Ct. 772, 775, 85 L.Ed. 1064, 1069 (1941), and that "waters of the state," see Mo.Ann.Stat. Sec. 260.500(11) (Vernon 1963) (defining "waters of the state" as all rivers, streams, lakes and other bodies of water") are property of the state. See McCready v. Virginia, 94 U.S. (4 Otto) 391, 394, 24 L.Ed. 248 (1876) ("The principle has long been settled in this Court, that each State owns the beds of all tide-waters within its jurisdiction. * * * In like manner, the states own the tide-waters themselves, and the fish in them, so far as they are capable of ownership while running. For this purpose the State represents its people, and the ownership is that of the people in their united sovereignty."); United States v. Turner, 175 F.2d 644, 647 (9th Cir.), cert. denied, 338 U.S. 85, 70 S.Ct. 92, 94 L.Ed. 521 (1949) (State has property interest in intrastate navigable waters.); Maine v. M/V Tamano, 357 F.Supp. 1097, 1100 (D.Me.1973) (State has sufficient quasi-sovereign or property interest in its coastal waters and marine life to maintain suit for damages caused by oil spill.); Maryland v. Amerada Hess Corp., 350 F.Supp. 1060, 1066-67 (D.Md.1972) (State has "proprietary interest" in its waters and may recover damages for cost of cleaning up oil-spill damage to these waters.); California v. S.S. Bournemouth, 307 F.Supp. 922, 929, clarified, 318 F.Supp. 839 (C.D.Cal.1970) (State suffers property damage when its waters are damaged by oil spill.); Hickey v. Hazard, 3 Mo.App. 480 (Mo.Ct.App.1877) (State of Missouri has property interest in waters of the state.)
 
 
 [15]
 See, e.g., Mo. Const., art. 4 Sec. 12 (establishment of department of conservation and Department of Natural Resources); Mo.Ann.Stat. Sec. 67.870-. 910 (Vernon Supp.1986) (open space conservation); Mo.Ann.Stat. Sec. 253.010 (Vernon 1963) (state's interest in "land" includes "every estate, interest and right, legal or equitable, in land or water"); Mo.Ann.Stat. Sec. 256.010 (Vernon 1963) (appointment of state geologist to survey state resources); Mo.Ann.Stat. Sec. 260.435-.550 (Vernon Supp.1986) (state's interest in preventing harm to property and people by abandoned hazardous waste dumps); Clean Air Act, 42 U.S.C.A. Secs. 7401-7642 (1982) (protection of "nation's air resources"); National Environmental Policy Act, 42 U.S.C.A. Secs. 4321-4347 (1982) (protection of "nation's environment"); Federal Water Pollution Control Act, 33 U.S.C. Secs. 1251-1376 (1982) (protection of "nation's waters"); CERCLA, supra (see 42 U.S.C. Sec. 9601(16), which states: " 'natural resources' means land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the fishery conservation zone established by the Magnuson Fishery Conservation and Management Act [16 U.S.C.A. Sec. 1801 et seq.] any State or local government, or any foreign government."
 
 
 [16]
 The two cases cited by Continental are inapposite. In Atlantic City Mun. Util, Auth. v. CIGNA, No. A-1320-84T7 (N.J.Super.Ct.App.Div. Dec. 19, 1985), the court held that costs incurred by a municipal water authority in drilling new wells and adding filtering devices to prevent potential contamination of its wells by nearby hazardous waste dumps are not recoverable under a CGL policy. In Linda Walls, v. Waste Resources Corp., No. 2-83-418 (E.D.Tenn. Oct. 11, 1983), the court adopted a magistrate's report suggesting distinction, for statute of limitations purposes, between suits for recovery of cleanup costs and suits claiming damages for injury to or loss of natural resources
 
 
 [17]
 For other cases implicitly finding that cleanup costs are recoverable "property damage," see, e.g., Mercury Refining Co. v. Hartford Fire Ins. Co., No. 84-CU-495 (N.D.N.Y. July 19, 1985); Payne v. United States Fid. and Guar. Co., 625 F.Supp. 1189, 1193 (S.D.Fla.1985); Port of Portland, 549 F.Supp. at 235; Technicon Electronics Corp. v. American Home Assurance Co., No. 08811/85 (N.Y.Sup.Ct. Nov. 1, 1985); Shapiro v. Public Service Mut. Ins. Co., 19 Mass.App.Ct. 648, 477 N.E.2d 146, 154 (Mass.App.Ct.1985); Buckeye Union Ins. Co. v. Liberty Solvents and Chem., 17 Ohio App.3d 127, 477 N.E.2d 1227, 1239 (Ohio Ct.App.1984); Waste Management of Carolinas, Inc. v. Peerless Ins. Co., 72 N.C.App. 80, 323 S.E.2d 726, 735 (N.C.Ct.App.1984), rev'd on other grounds, 315 N.C. 688, 340 S.E.2d 374 (1986); CPS Chem. Co. v. Continental Ins. Co., 199 N.J.Super. 558, 489 A.2d 1265, 1269 (N.J.Super.Ct.Law Div.1984)
 
 
 [18]
 The CERCLA claims in the EPA and IPC suits were brought solely under 42 U.S.C. Sec. 9607(a)(4)(A) for cleanup costs
 
 
 [19]
 On March 10, 1986, the United States Supreme Court in Exon Corp. v. Robert Hunt, --- U.S. ----, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986), held that the New Jersey Spill Compensation and Control Act's (N.J.Stat.Ann. Secs. 58:10-23.11 to 58:10-23.112) (West 1982 and Supp.1985) imposition of a "spill fund" tax on major petroleum and chemical facilities in the state is partially preempted by section 114(c) of CERCLA, 42 U.S.C. Sec. 9614(c). Dicta in the opinion points both ways as to whether governmental cleanup costs may be considered "property damage." Given that the issues there have no relation to the issues here, we find this dicta not helpful in resolving the present case
 
 
 [20]
 The Missouri Supreme Court's decision in Jack L. Baker Cos. v. Pasley Mfg. & Distrib. Co., 413 S.W.2d 268 (Mo.1967), suggests that Missouri would follow this majority view. There, the Court held that under Missouri law, damages in real property cases are calculated as either the difference in value before the injury and after, or the cost of restoring the real property to its original condition, whichever is the lesser. Id. at 273-74. Because the hazardous waste contamination alleged in the EPA and IPC suits spread widely from the originally contaminated property to other property and the groundwater of the state, it seems clear that the cost of cleaning up the contamination would be the lesser measure of damage. Moreover, although the Missouri courts have not squarely confronted the issue, the appropriate measure of damages in a case involving improper disposal of hazardous wastes may include both the cost of cleanup and the damages measured by the remaining diminution in the value of natural resources. In the case at hand, we are faced, however, only with the question of whether cleanup costs are recoverable
 
 
 [21]
 The state points out that this distinction between property damage and their compensatory damages is so well established it is set forth in Black's Law Dictionary (4th ed. 1951):
 Damage. Loss, injury or deterioration, caused by the negligence, design or accident of one person to another, in respect of the latter's person or property. The word is to be distinguished from its plural,--"damages"--which means a compensation in money for a loss or damage.
 Citation to meaning given ordinary language in a respected dictionary is particularly relevant in a case involving the construction of insurance policy terms because of the well-established principle that insurance policy language must be given the meaning that it would convey to an ordinary insured. Robin v. Blue Cross Hospital Service, Inc., 637 S.W.2d 695, 698 (Mo.1982) (en banc). We agree with the state and supporting amici that an ordinary insured chemical company would read the term "property damage" to include environmental damage and would also conclude that the cost of cleaning up such damage is recoverable. Moreover, to the extent the term "property damage" is ambiguous as applied to environmental property damage, the ambiguities must be construed against the insurer and in favor of finding coverage for the insured. See Hon v. Director, Office of Workers' Comp. Programs, 699 F.2d 441, 443 (8th Cir.1983); Bellamy v. Pacific Mut. Life Ins. Co., 651 S.W.2d 490, 495-96 (Mo.1983).
 Additionally, the United States Supreme Court's decision in St. Paul Fire and Marine Ins. Co. v. Barry, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978), supports the state's claim that under an "occurrence" policy like that at issue here, only the property damage rather than the claim for compensation for this damage must occur during the policy period:
 An "occurrence" policy protects the policyholder from liability for any act done while the policy is in effect, whereas a "claims made" policy protects the holder only against claims made during the life of the policy.
 Id. at 535, 98 S.Ct. at 2927.
 
 
 [22]
 Under Missouri law, the time of an "occurrence" within the meaning of an indemnity policy is the time the loss or damage was sustained and not the time when the negligent or wrongful act was committed. Hawkeye-Security Ins. Co. v. Iowa Nat'l Mut. Ins. Co., 567 S.W.2d 719, 720 (Mo.Ct.App.1978)
 
 
 [23]
 CERCLA section 107, 42 U.S.C. Sec. 9607, provides for liability under the Act whenever there is a "release, or a threatened release which causes the incurrence of response costs, of a hazardous substance." 42 U.S.C. Sec. 9601(22) states, in relevant part,
 "release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment[.]
 
 
 [24]
 However, various other policy provisions and exclusions may exclude coverage, but these issues are not before us on this appeal
 
 
 [25]
 See also Shapiro, 477 N.E.2d at 149; Techalloy Co. v. Reliance Ins. Co., 338 Pa.Super. 1, 487 A.2d 820, 823-26 (Pa.Super.Ct.1984). Cf. Jackson Tp. Mun. Util. Auth. v. Hartford Accident & Indem. Co., 186 N.J.Super. 156, 451 A.2d 990, 995 (N.J.Super.Ct.Law Div.1982); Waste Management of Carolinas, 72 N.C.App. 80, 323 S.E.2d 726; Port of Portland, 549 F.Supp. at 233; Kutsher's, 465 N.Y.S.2d at 136; Niagara County, 439 N.Y.S.2d at 538
 
 
 [26]
 See, e.g., Commercial Union Ins. Co. v. Sepco Corp., 765 F.2d 1543, 1546 (11th Cir.1985); Hancock Laboratories, Inc. v. Admiral Ins. Co., 777 F.2d 520, 524 (9th Cir.1985); Ducre v. Executive Officers of Halter Marine Co., 752 F.2d 976, 994 (5th Cir.1985); Insurance of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1223 (6th Cir.1980), aff'd and clarified on reh'g, 657 F.2d 814, cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981) (Date of occurrence is the date on which the injury-producing agent first contacts the body.)
 
 
 [27]
 See, e.g., Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034, 1047 (D.C.Cir.1981), cert. denied, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982) (Date of occurrence is the continuous period from exposure to manifestation.)
 
 
 [28]
 The case which the district court relied on, Kirkham and Michael & Assoc., Inc. v. Travelers Indem. Co., 361 F.Supp. 189 (D.S.D.1973), aff'd, 493 F.2d 475 (8th Cir.1974), falls into this category. In Kirkham, an engineering corporation contracted with the City of Rapid City, South Dakota, to design, oversee the construction of, and to make a final inspection of a waste treatment plant for the city. Once the plant was finally inspected, turned over to the city, and set in operation, the city learned that the plant was "deficient" in several respects. The city sued the engineering firm and the firm's insurance carrier brought an action seeking a declaration that its policy during the construction period (later policies contained an exclusion for damages arising from professional malpractice/negligence suits) did not provide coverage. The insurer's argument was that, although the negligent construction and supervision occurred during the policy period, the city did not suffer damage until the plant was turned over to it and operation of the plant revealed its deficiencies. The district court agreed and held that there was no coverage and, thus, no duty to defend the firm in the city's suit. 361 F.Supp. at 193-94. This Court affirmed on the basis of the district court's opinion. 493 F.2d at 475. Kirkham is distinguishable from the present case in many respects. First of all, the factual situation is inapposite. Second, it is an example of a negligence case where the negligence was not accompanied by immediate damage or injury, as was the case in the above-cited hazardous waste and progressive disease cases. See also Kissel v. Aetna Cas. & Sur. Co., 380 S.W.2d 497 (Mo.Ct.App.1964) (Finding insurance coverage for damage manifested after policy lapsed because the act of negligence during the policy period was accompanied by immediate physical damage or injury.). Third, the city in Kirkham had no ownership interest in the sewage plant until it was turned over to it. It was only at that time, after the relevant policy lapsed, that the city was injured by learning that the plant did not work as projected
 
 
 [29]
 We hold that in a cleanup cost recovery case, the date of the insured "occurrence" is the date on which the hazardous wastes were improperly disposed of. In other words, we adopt the "exposure" view of coverage. Accordingly, only the first CGL policy at issue provides coverage for the damages proved in the EPA case. See, e.g., Hancock Laboratories, Inc., 777 F.2d at 524-25. A recent Harvard Law Review comment argues that the appropriate standard for property damage caused by hazardous waste should be the "continuous trigger" rule which provides that the property damage occurrence is continuous, extending from disposal to manifestation of the damage. Developments in the Law, Toxic Waste Litigation, 99 Harv.L.Rev. 1458, 1581-83 (1986). See also, Note, The Applicability of General Liability Insurance to Hazardous Waste Disposal, 57 S.Cal.L.Rev. 745, 758-59 (1984). Perhaps most supportive of the continuous trigger theory is the presumption of maximum coverage. See American Home Prods. Corp., 565 F.Supp. at 1491-92. Additionally, hazardous waste damage is a continuous process, which suggests that the time of the property damage occurrence extends from the time of improper disposal to the time the damage is manifested. However, the Kissel case suggests that, under Missouri law, the continuing damage would be covered under the policy in effect when the damage first occurred, 380 S.W.2d at 509, at least where, as here, this can be readily determined. As the Harvard Law Review article suggests, the continuous trigger theory might have merit in fact situations different from that posed here, such as where it is impossible to determine when the improper release occurred. In this situation, it may be reasonable to view the time of the occurrence as the time the accident or release is first discovered. We are not faced with such a situation here, however, and we are not persuaded that the continuous trigger theory has merit in a cleanup cost recovery case such as this one where the date of the first property damage occurrence is clear and where the cleanup efforts have been pinpointed at the site of this damage
 
 
 [30]
 See supra note 5, on the "occurrence" question. There is no remaining issue on the "pollution exclusion" clause, however, because the property damage proved in the EPA case occurred during the first CGL policy which does not contain a pollution exclusion clause